**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **MARIA ARTEAGA, OFELIA ARTEAGA,** | ) | |
| **MARIA AVINA, ROSA BRISEÑO,** | ) | |
| **KIMBERLY CAMBRA, JOSE DELGADO,** | ) | |
| **MIKE DICKEY, MARIA GONZALEZ,** | ) | |
| **BRYAN HODSON, ADALBERTO JIMENEZ,** | ) | |
| **MARIBEL JIMENEZ, GARY KRAMER,** | ) | |
| **MARIA MADRID A/K/A MARIA ZUÑIGA,** | ) | |
| **DONNA MAGNUSON, MONICA MARES,** | ) | |
| **PABLINO MARTINEZ, GUADALUPE MENDOZA,** | ) | |
| **SILVIA PEREZ, ROBIN RITCHEY,** | ) | |
| **BRENDA RODRIGUEZ, IRMA RODRIGUEZ,** | ) | |
| **JESENYA RODRIGUEZ, JUAN RODRIGUEZ,** | ) | |
| **DOROTHEA SCHMIDT, PATRICIA SEIDL,** | ) | **No. 10 C 1444** |
| **RUDOLPH SEIDL, KENNETH SOCKI,** | ) | |
| **WILLIAM VAN DUSEN, MARIA VAZQUEZ,** | ) | **Judge Rebecca R. Pallmeyer** |
| **FELIPE ZUNIGA, CHARMAINE SCHALLMO,** | ) | |
| **MARGARET LORDAN,  AGATA TOMAS,** | ) | |
| **and PATRICK BACA** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **September 6, 2012** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **KEVIN LYNCH and MICHAEL LYNCH,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs bring this action against Defendants Kevin Lynch and Michael Lynch to recover unpaid wages under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, the Illinois Minimum Wage Law ("IMWL"), 820 ILCS 105/1 *et seq.*, and the Illinois Wage Payment and Collection Act ("IWPCA"), 820 ILCS § 115/1 *et seq.*  Defendant Kevin Lynch was formerly the president and sole owner of Duraco Products, Inc. ("Duraco"), the manufacturing company which employed Plaintiffs until it ceased operations in February 2010.  Defendant Michael Lynch assisted his brother Kevin in the management of Duraco.  Plaintiffs assert various claims against Defendants for failure to pay minimum wages, overtime wages, vacation pay, and also for retaliatory discharge. In this motion, Plaintiffs seek summary judgment on Defendants' legal status as employers and

liability under the aforementioned statutes.  They concede that a trial will be necessary to determine damages.  For the reasons explained herein, the court grants Plaintiffs' motion in part and denies it in part with respect to Kevin Lynch, but denies summary judgment on all claims against Michael Lynch.

## FACTUAL BACKGROUND

**I.     History of Duraco Products, Inc**.

Defendant Kevin Lynch is the sole owner and manager of U.S. Composites, a corporation that purchased Duraco in May 2007.  (K. Lynch Dep. (2011), Ex. B to Pl.'s 56.1, 9:5-15.)[1]  Duraco was a "plastic injection molding facility" that sold "plastic plantware," such as watering cans and flower pots, to customers throughout the North America.  (K. Lynch Dep. (2011) 5:18-6:6.)  When Kevin Lynch acquired Duraco, the company was already losing "a lot of money."  (K. Lynch Dep. (2011) 10:22-23.)  Kevin Lynch testified that, within six months of assuming ownership of Duraco, he learned the company carried roughly $35 million in previously undisclosed liabilities.  (K. Lynch Dep. (2011) 46:10-48:5.)   In an attempt to turn the company around, Kevin Lynch initiated significant cost-cutting measures.  (K. Lynch Dep. (2011) 48:20-23.)

Simultaneously with his acquisition of Duraco, Kevin Lynch entered into a factoring agreement, on Duraco's behalf, with Franklin Capital Corporation ("Franklin").   (K. Lynch Dep. (2011) 50:7-8; Factoring Agreement, Ex. N to Pls.' 56.1.)  Under the factoring agreement, Franklin purchased Duraco's accounts receivable at a discounted rate.  Franklin would advance to Duraco 80 percent of the amount owed on each receivable invoice, collect the full payment from the customer, and then turn over the remaining 20 percent, less interest and Franklin's fees, to Duraco.  (K. Lynch Dep. (2011) 49:14-50:21.)  Unfortunately for Duraco and its employees, Kevin

---

[1]     The court refers to this deposition as "K. Lynch Dep. (2011)" because the record also contains excerpts from a 2010 deposition of Kevin Lynch, which the court will refer to as "K. Lynch Dep. (2010)."  The 2010 deposition appears to have been taken in connection with Duraco's bankruptcy proceedings.

Lynch claims, Franklin "never honored [the] agreement." (K. Lynch Dep. (2011) 52:13.) He stated that, "three or four months into ownership," he realized that Franklin was routinely underfunding Duraco. (K. Lynch Dep. (2011) 52:14-23.) He gave an example: "You generate [$100,000] in receivables. You're looking for $80,000. You get wired $40,000. You try to meet with [Franklin] the next morning to figure out what happened to the remaining $40,000, and they don't account for it." (K. Lynch Dep. (2011) 52:18-23.) Kevin Lynch described Duraco's relationship with Franklin as "a fight" that ultimately resulted in Duraco's hiring an accounting firm to conduct a forensic accounting of Franklin's records, and, as explained below, the termination of the factoring agreement. (K. Lynch Dep. (2011) 53:16-24.)

Because of its ongoing financial instability, Duraco began to struggle to meet its payroll obligations. According to Plaintiffs, Duraco first failed to make full payment of wages to its employees in March 2008 (Pl.'s 56.1 ¶ 28); they cite a March 21, 2008 check payable to Bryan K. Hodson that the bank returned for insufficient funds. (Check No. 121044 of Sampling of Returned Employee Checks, Ex. O to Pl.'s 56.1, at 5.) The record includes other employees' paychecks that were returned for insufficient funds dated August 22, 2008; August 29, 2008; September 5, 2008; September 12, 2008; October 3, 2008; November 14, 2008; and September 25, 2009.[2] (*See* Sampling of Employee Checks.) In further support of this assertion, Plaintiffs

---

[2]     Defendants challenge the authenticity of virtually all Plaintiffs' evidence demonstrating Duraco's failure to meet its payroll obligations. Of the more than 30 exhibits Plaintiffs attached to their Rule 56.1 statement, Defendants appear to challenge all but one—Duraco's factoring agreement with Franklin. (Defs.' Resp. to Pls.' Mot. for Summ. J. [113] at 7-8.) They argue that "[e]ach of the documents are presented for the truth of the matters submitted and are either hearsay documents or documents submitted without proper foundation." (Defs.' Resp. at 7.) But the exhibits the court relies on in this opinion, as Plaintiffs note, are identified by Defendants at their depositions, are subject to the business records hearsay exception, or could otherwise be authenticated by Plaintiffs' and Defendants' testimony at trial.

In any event, Defendants' objection has little merit here, where Defendants themselves have offered no evidence of payroll practices beyond their own deposition testimony. If Hodson's paycheck truly were inauthentic, surely Defendants could establish as much by providing the court with copies of "authentic" paychecks for comparison. Defendants have not done so, however; their

(continued...)

submitted America United Bank statements for Duraco's commercial checking account which, Plaintiffs claim, show "gaps between cashed check numbers[] with numerous Pro/Data payroll[-]issued checks remaining uncashed . . . ."[3]  (American United Bank Statements, Ex. Q to Pls.' 56.1; Pls.' 56.1 ¶ 28.)  The bank statements do show gaps in check numbers indicating uncashed checks, as well as some checks that were returned for insufficient funds, but it is not obvious that any uncashed checks were necessarily payroll checks or that they were uncashed because they were not distributed to employees.

Defendants offer no explanation for the gaps, but Kevin Lynch did acknowledge that paychecks were not always distributed; he testified that "when we didn't hand out payroll checks, those checks that should have gone out were put aside."  (K. Lynch Dep. (2010), Ex. G to Pls.' 56.1, 52:19-21.)  On those occasions, Dorothea Schmidt would hold onto the checks "in an office," but, Kevin Lynch stated, he did not know what she did with them.  (K. Lynch Dep. (2010) 52:24-53:18.)  Nevertheless, Kevin Lynch "sometimes" had "access" to the undisbursed checks, and he acknowledged that he could issue one of the checks if he chose to do so.  (K. Lynch Dep. (2010) 53:19-23.)  For their part, Plaintiffs have submitted copies of a number of employee paychecks they describe as "undisbursed" (Sampling of Undisbursed Employee Checks, Ex. P to Pls.' 56.1 [109]), though they have not shown that any of the checks numbers of those undisbursed checks fall in the check number gaps shown on the bank statements.

Plaintiffs do, however, submit other evidence demonstrating that Duraco failed to make payroll from time to time.  They submitted a spreadsheet, identified by Kevin Lynch at his deposition as a spreadsheet that recorded "what employees told [him] they were owed."  (K. Lynch Dep.

---

[2](...continued)
bald challenge to Plaintiffs' exhibits is overruled.

[3]      Pro/Data Payroll Services ("Pro/Data") processed Duraco's payroll and printed paychecks during the relevant time period.

(2010) 69:22-24; Pre 11/18/08 Payroll Issues Spreadsheet, Ex. R to Pls.' 56.1.) The spreadsheet lists 31 employees who reported being owed money by Duraco, and includes individual entries for each paycheck that was returned for insufficient funds or never received in the first place. (*See* Pre 11/18/08 Payroll Issues Spreadsheet.) Defendants contend that the spreadsheet represents merely a record of Plaintiffs' allegations of monies owed rather than an accounting of actual unpaid wages. Notably, however, when Kevin Lynch created the spreadsheet, he marked with an asterisk the entries for back pay claims where "no documentation was provided to show [insufficient funds] for check." (Pre 11/18/08 Payroll Issues Spreadsheet at 3.) For roughly half the unpaid checks listed there is no asterisk; the court infers that, for those entries, the employee did provide Kevin Lynch with documentation demonstrating that the check was returned by the bank. Moreover, a second spreadsheet labeled "Checks Not Received: Reconciliation" lists at least 37 employees who, on at least one occasion, if not more, did not receive a paycheck they were owed.[4] (*See* Undistributed Checks Spreadsheet, part of Ex. R to Pls.' 56.1.) The Undistributed Checks Spreadsheet lists payroll checks, complete with dates and check numbers, undistributed by Duraco and totaling $52,545.96.[5] (Undistributed Checks Spreadsheet at 4.)

The record also includes e-mail messages from Duraco employees Kimberly Cambra and Donna Magnuson to Kevin and Michael Lynch, documenting the paychecks that Cambra and Magnuson believed Duraco owed them. (Dec. 8, 2009 E-Mail From Kimberly Cambra to Kevin and

---

[4]    It is not entirely clear to the court who created this second spreadsheet. Plaintiffs submitted it as part of the same exhibit as the first spreadsheet, which was authenticated by Kevin Lynch at his deposition. Like the first spreadsheet, the copy of the second spreadsheet in the record bears a sticker denoting that it was identified as an exhibit at Kevin Lynch's May 2010 deposition. Plaintiffs did not provide the court with the full transcript from that deposition or any other evidence authenticating the second spreadsheet, but the court presumes that it too was created by Kevin Lynch.

[5]    None of the entries on the Undistributed Checks spreadsheet, however, match the aforementioned copies of Undisbursed Checks Plaintiffs submitted.

Michael Lynch, Ex. S to Pls.' 56.1; Dec. 6, 2009 E-Mail from Donna Magnuson to Kevin and Michael Lynch, also in Ex. S to Pls.' 56.1.)   In her December 8, 2009 message, Cambra stated that, including $183 in fees incurred as a result of her inability to timely pay bills, Duraco owed her $5,679.04.  (Dec. 8, 2009 E-Mail from Kimberly Cambra.)  Just the day before, Kevin Lynch had written a letter to Kimberly Cambra's mortgagor explaining that Cambra was an employee in good standing at Duraco, but that "[d]ue to the financial restructuring and refinancing of [Duraco], Kimberly is behind several paychecks."  (Dec. 7, 2009 Letter from Kevin Lynch to America's Servicing Company, Ex. T to Pls.' 56.1.)  The letter promised that "Duraco intends to make good on those checks in the forthcoming weeks" and implored the mortgagor to forgive Cambra's late mortgage payment, "as it [was] through no fault of her own that the mortgage payment [was] late." (*Id.*)

Kevin Lynch had a similar exchange with Donna Magnuson.  On December 6, 2009, Donna Magnuson sent Kevin Lynch an e-mail in which she claimed to be owed more than $20,000 in back wages and business expenses.  (Dec. 6, 2009 E-Mail from Donna Magnuson.)  Kevin Lynch then wrote a letter, addressed generally to Magnuson's creditors, in which he declared that Duraco owed Magnuson for "several payroll periods," but that it intended to fulfill its obligations by the end of January 2010.  (Dec. 30, 2009 Letter from Kevin Lynch Regarding Donna Magnuson, Ex. T to Pls.' 56.1.)  The letters to Cambra's mortgagor and Magnuson's creditors are on Duraco letterhead and are signed by Kevin Lynch.  And as further proof of Duraco's failure to fully compensate its employees, Plaintiff Bill Van Dusen testified that he ultimately resigned his position because "[he] wasn't getting paid."[6]  (Van Dusen Dep., Ex. V to Pls.' 56.1, 65:23-24.)

Defendants offer little evidence to the contrary.  Indeed, Kevin Lynch plainly acknowledges

---

[6]     Van Dusen's position at Duraco is not identified in the record.

that, from time to time, some Duraco employees did not receive their paychecks.[7]  (*See, e.g.*, K. Lynch Dep. (2010) 31:4) (expressing frustration that he could not "make payroll"); (*see also* K. Lynch Dep. (2011) 68:8-19, 85:22-86:2, 88:4-6.)  He testified that Duraco first started to "get behind on its payroll" in March 2009, because that was when Franklin stopped funding Duraco "completely."  (K. Lynch Dep. (2011) 68:11-19.)  When asked if there was a point before March 2009 when Duraco could not make payroll, he replied, "I want to say no.  We were pretty consistent. There may have been a check or two.  I don't know."  (K. Lynch Dep. (2011) 68:14-17.)  But he also stated that "there were times during the Chapter 11 bankruptcy [filed in November 2008] when employees of Duraco . . . got behind on pay."[8]  (K. Lynch Dep. (2011) 58:7-9, 69:5-7.)

Michael Lynch's testimony concerning Duraco's alleged failure to fully compensate its employees was inconsistent, at best:

> Counsel:  Mr. Lynch, can we agree that at a certain point between 2008 and February of 2010, Duraco Products was unable to make payroll at various points, and by making payroll, I mean that was [sic] unable to compensate all of its employees for their earned wages in given weeks?
>
> M. Lynch:  I can't agree with that.
>
> Counsel:  Could you explain to me why you disagree with that statement?
>
> M. Lynch:  Because the company was profitable.
>
> Counsel:  Is it your testimony that employees got paid every work week for their earned wages?

---

[7]  As for his own paycheck, Kevin Lynch testified that during Duraco's bankruptcy proceedings, which began on November 18, 2008, he took "four or five checks" and that "after April or May 2009, [he] took no more salary from the company." (K. Lynch Dep. (2011) 75:4-7.)  At some point "maybe three or four months" after Kevin Lynch stopped receiving a salary, Michael Lynch also stopped taking a paycheck.  (M. Lynch Dep. 64:15-24.)

[8]  Kevin Lynch's decision to file for Chapter 11 bankruptcy on behalf of Duraco does not appear to be directly related to Duraco's alleged inability to meet payroll at the time.  Kevin Lynch explained that Duraco was in a legal dispute with its landlord, and that the landlord had actually succeeded in terminating the lease.  (K. Lynch Dep. (2011) 58:10-19.)  Kevin's attorney advised him to file for bankruptcy in order to halt the eviction proceedings.  (*Id.*)

| M. Lynch: | No. |
|---|---|
| Counsel: | That's really what I am trying to get to.  Can we agree there were weeks when employees were not paid their earned wages? |
| M. Lynch: | I can't agree to that. |

(M. Lynch Dep. 59:7-23.)  Neither Defendant made any attempt to submit evidence demonstrating that Duraco's employees had, indeed, been paid all the wages they were owed.  The only exhibits Defendants attach to their Statement of Additional Facts are the deposition transcripts from their May 2011 depositions.

Defendants did not equivocate, however, when it came to identifying the culprit they believed responsible for Duraco's financial woes: Franklin.  Both Kevin and Michael Lynch accused Franklin of "stealing money" from Duraco.  (*See, e.g.*, K. Lynch Dep. (2011) 88:15-16, 111:3-7; M. Lynch Dep. 54:14-18, 65:14-24.)  Kevin Lynch testified that Franklin stole "millions of dollars" from Duraco, even while Duraco was undergoing bankruptcy proceedings.  (K. Lynch Dep. (2011) 118:8-12.)  He also claimed that Franklin threatened to cut off funding if Lynch paid the employees before paying Duraco's vendors, and that his contacts at Franklin expressly told him, "[o]n more than one occasion . . . 'You don't make payroll.  You pay these vendors.  If you make payroll, we're not funding you.'" (K. Lynch Dep. (2011) 109:7-11.)  Thus, according to Kevin Lynch, "[t]here were times vendors were paid before employees, and that was at the sole direction of Franklin." (K. Lynch Dep. (2011) 88:2-3.)  No other evidence in the record corroborates Kevin Lynch's account of these threats from Franklin.

If a pay day arrived and Kevin Lynch "had trouble getting money from Franklin," he would instruct the shift supervisors, John Cirillo and Bill Sasser, not to distribute the paychecks.  (K. Lynch Dep. (2011) 82:7-11.)  Lynch concedes that on those occasions when he made the decision to withhold paychecks because of insufficient funds, he never did anything to ensure that the employees were eventually compensated for the wages owed them.  (K. Lynch Dep. (2011) 93:16-

8

20.)   Kevin Lynch acknowledged, further, having received complaints from employees about paychecks returned for insufficient funds, though he doesn't recall when or how often he received any such complaints.   (K. Lynch Dep. (2011) 83:10-22.)   As required by the bankruptcy proceedings, Kevin signed and filed operating reports detailing Duraco's finances, but he admitted that he did not confirm that the employees' paychecks had cleared the operating account before signing those reports.  (K. Lynch Dep. (2011) 119:24-120:4.)

Duraco's financial troubles also affected Plaintiffs' health insurance coverage.  When an employee opted into Duraco's Blue Cross/Blue Shield ("BCBS") health insurance plan, Duraco would deduct the employee's contribution toward the premiums from his or her paycheck. (K. Lynch Dep. (2011) 127:10-17.)   In late January 2010, insured Plaintiffs, such as Donna Magnuson, William Van Dusen, and Kenneth Socki, were surprised to receive notification from BCBS that their insurance coverage had been cancelled as of May 1, 2009—Duraco never informed them of the policy's termination and was, in fact, still deducting payments for premiums from their paychecks.  (Certificates of Group Creditable Coverage, Ex. Y to Pls.' 56.1, at 1-3; Pls.' 56.1 ¶¶ 47, 48.)   Indeed, Plaintiffs submitted copies of paychecks dated May 29, 2009, through January 15, 2010, demonstrating a deduction for "Medical," *i.e.*, health insurance coverage. (Copies of Plaintiffs' Paychecks, Ex. X to Pls.' 56.1, at 1-14.)

For his part, Kevin Lynch admitted that Duraco actually missed a premium payment in August or September 2009, prompting BCBS to file a motion seeking termination of the policy, which the bankruptcy court ultimately denied.  (K. Lynch Dep. (2011) 129:12-16.)   He stated, further, that BCBS's attempts to terminate the policy continued through December 2009 and were still pending before the bankruptcy court when the proceedings were converted from Chapter 11 to Chapter 7 in February 2010.  (K. Lynch Dep. (2011) 130:6-20.)   Lynch nevertheless claimed ignorance of the reason(s) the coverage was canceled as of May 2009.  (K. Lynch Dep. (2011) 129:23-130:8.)   He testified that BCBS had "[n]o valid reason" for terminating the policy, but

admitted he "didn't devote a whole lot of time" to investigating the matter.  (K. Lynch Dep. (2011) 130:9-11, 134:11-135:4.)  Kevin Lynch did not explain why Duraco continued to deduct premium payments from employees' checks after the coverage had ended, or whether he had taken any steps to reimburse employees for the erroneous deductions.[9]

Sometime in 2009, Duraco obtained a release from its factoring agreement with Franklin and entered into a new factoring agreement with Bibby Financial Services ("Bibby").  (K. Lynch Dep. (2011) 50:11-13.)  Kevin Lynch described the agreement with Bibby as "very similar" to the Franklin factoring agreement.  (K. Lynch Dep. (2011) 51:19.)  Even under the new agreement, though, Duraco was unable to make ends meet.  On February 17, 2010, the bankruptcy judge issued an order converting Duraco's Chapter 11 bankruptcy to a Chapter 7 bankruptcy.[10]  (Feb. 17, 2010 Order Converting Case Under Chapter 11 to Case Under Chapter 7, Ex. CC to Pls.' 56.1.)  On that day, production at Duraco ceased and the plant was closed down.  (M. Lynch Dep. 128:12-129:1.)

## II.     Defendants' Job Responsibilities at Duraco

### A.     Kevin Lynch

Upon acquiring Duraco, Kevin Lynch assumed the position of president.  (K. Lynch Dep. (2011) 96:22-24.)  In that role, he had the authority to change the employee pay scale, to give raises to individual employees, to approve employee vacation requests, and to endorse deposit slips or checks on behalf of Duraco.  (K. Lynch Dep. (2011) 64:15-18, 105:4-11, 106:11-12, 120:18-23; *see also* K. Lynch Dep. (2010 ) 29:5-8.)  He "had the authority to fire and fire employees."

---

[9]     Duraco's continued withholding of insurance premium may not be directly relevant to Plaintiffs' claims for wages under the FLSA, the IMWL, or the IWPCA, but the circumstances reflect Duraco's pattern of staying afloat by taking advantage of its employees, and arguably support a claim for conversion.

[10]     Michael Lynch appears to believe Bankruptcy Judge Wedoff was moved to convert the case to a Chapter 7 proceeding by a "crazy woman . . . [who] said bad things and lied to the judge," causing him to order the conversion.  (M. Lynch Dep. 98:18-22.)  Lynch acknowledged, however, that "Duraco was finding it more difficult to meet [its] obligations."  (M. Lynch Dep. 83:2-3.)  There is no basis in this record for any challenge to the bankruptcy court's decision.

(Answer [45] ¶ 6.)  He was the only signatory on Duraco's corporate bank account, and he was able to reimburse himself for business-related expenses by writing a check, payable to himself, on that account.  (K. Lynch Dep. (2011) 64:24-65:2, 77:8-16.)  Though Kevin Lynch did consider advice from his brother Michael, he claimed ultimate responsibility for the decisions to file bankruptcy on behalf of Duraco, to sue Franklin for breach of the factoring agreement, and to change Duraco's health insurance carrier.  (K. Lynch Dep. (2011) 59:18-20, 118:16-18, 125:16-21.)  In Kevin Lynch's own words, "[a]t the end of the day . . . it all came down on [his] desk"; he "ma[de] . . . the final decisions."  (K. Lynch Dep. (2010) 25:14-17; 26:17.)

Kevin Lynch's position as president of Duraco and as the sole signatory on Duraco's corporate bank account are undisputed, but Lynch nevertheless attempted to deflect responsibility for the company's payroll.  Kevin Lynch stated that he "did not handle payroll" and that "[w]hile Pro/Data had authority to add Kevin Lynch's electronic signature to paychecks, Kevin Lynch does not know how Pro/Data got that authority."  (Defs.' 56.1, Attach. 1 to Defs.' Resp., ¶ 7.)  Kevin Lynch is "sure" he "authorize[d]" his signature on the payroll checks, but he had no recollection of signing any documents for Pro/Data.  (K. Lynch Dep. (2011) 80:22-81:3, 97:1-2.)  Thus, though Pro/Data had "the authority to put [his] signature on checks they generate," Lynch nevertheless insisted that "[he] didn't authorize Pro/Data to print those checks."  (K. Lynch Dep. (2011) 94:20-21, 96:7-9.)  Lynch asserted repeatedly that no one else could issue a check drawn on Duraco's account (*see, e.g.*, K. Lynch Dep. (2011) 101:10-24), but suggested that a low-level administrative employee had more control over payroll than he did:

| | |
|---|---|
| Counsel: | You don't know who gave Pro/Data the authority [to write checks on Duraco's bank account]? |
| K. Lynch: | Don't know.  I know on a weekly basis Dorothea Schmidt submitted payroll to Pro/Data.  That's as far as I know. |
| Counsel: | Did anybody have to approve the payroll that Dorothy [sic] Schmidt submitted to Pro/Data? |

| K. Lynch: | No. |
|---|---|
| Counsel: | So Dorothea had the ultimate say of how many hours somebody worked? |
| K. Lynch: | In hindsight, it's sad; but, yes, she did. |
| Counsel: | Who gave her that authority? |
| K. Lynch: | I gave her that authority. |
| Counsel: | So ultimately it was your authority? |
| K. Lynch: | No. I gave her the responsibility task [sic] of that job right there, what she had to do to get payroll pulled together, what it was, and get it to Pro/Data. |
| Counsel: | So she performed the task? |
| K. Lynch: | She performed the task. |
| Counsel: | But you gave her the authority? |
| K. Lynch: | I guess I gave her the authority. |
| Counsel: | So you had the authority to give? |
| . . . | |
| K. Lynch: | I had the authority to give to Dorothea to take that task, correct. |

(K. Lynch Dep. (2011) 98:24- 100:5). Kevin Lynch also believes that Lesley Basely, who worked in accounts receivable before Schmidt, or Hank Gorry, who briefly held the title of comptroller, "could have" had the authority to issue payroll checks. (K. Lynch Dep. (2011) 97:21-98:3, 135:16-136:2.)

As Plaintiffs emphasize, however, "authority regarding payroll remained with Kevin Lynch." (Pls.' Reply to Defs.' 56.1 [116] ¶ 7.) Kevin Lynch testified that, when Duraco had insufficient funds to cover payroll costs, it was he who decided to withhold payroll checks from employees. (Pls.' Reply to Defs.' 56.1 ¶ 7; K. Lynch Dep. (2010) 39:6-19.) Plaintiffs also point to a July 11, 2008 e-mail message from Kevin Lynch to a Pro/Data employee which stated, "[P]lease allow this e-mail

to serve as my authorization for Lesley Basely, here at Duraco Products, Inc., to have access to our prodata [sic] account." (July 11, 2008 E-Mail from Kevin Lynch to Sherry Ingram, Ex. M to Pls.' 56.1, at 1.) This evidence, when considered in conjunction with Kevin Lynch's role as Duraco president and sole signatory on Duraco's bank account, requires the conclusion that Kevin Lynch did, in fact, exercise primary control over Duraco's payroll.

Kevin Lynch was also highly involved in the day-to-day operations of Duraco. Though he testified that he was not at Duraco on a daily basis (K. Lynch Dep. (2011) 22:11-13), he also admitted that "[e]arly on most of [his] time was spent at Duraco." (K. Lynch Dep. (2011) 24:16-18.) According to Kevin Lynch, the various department heads at Duraco reported to him, and "[i]f they needed something . . . [he] was usually available." (K. Lynch Dep. (2011) 23:1-5.) Kevin Lynch also selected the staffing agencies with which Duraco maintained contractual relationships. (K. Lynch Dep. (2011) 41:2-5.) He held in-house staff meetings in order to explain the financial troubles plaguing Duraco (K. Lynch Dep. (2011) 114:1-11, 114:20-115:17), and he conducted private conversations with individual employees about the wages they claimed they were owed. (*See, e.g.*, K. Lynch Dep. 90:12-15) (describing how Donna Magnuson told him Duraco owed her wages). Kevin Lynch also kept records of the employees' claims for wages. (K. Lynch Dep. (2010) 69:4-16; *see also* Pre 11/18/08 Payroll Issues Spreadsheet.) In some cases, he wrote letters to employees' creditors explaining that the employees were in good standing and were owed back wages by Duraco. (Letters from Kevin Lynch to Kimberly Cambra's and Donna Magnuson's Creditors, Ex. T to Pls.' 56.1.) The record amply supports the conclusion that Kevin Lynch managed Duraco's operations.

### B.    Michael Lynch

Kevin Lynch's brother, Michael Lynch, also held a position of authority within Duraco, though his precise role is disputed. Michael Lynch described himself as a "consultant" in the "management turnaround business" (M. Lynch Dep. [119] 8:19-21), and stated that, while at Duraco, he served

13

as "an assistant to the Chief Executive Officer and Chief Operating Officer in charge of strategic planning." (M. Lynch's Resp. to Pls.' First Set of Interrogs., Ex. D to Pls.' 56.1 ¶ 1.) Kevin Lynch referred to Michael as a "consultant" and a "sounding board." (K. Lynch Dep. (2010) 29:13, 29:23.) Kevin Lynch confirmed that Michael assisted, "on a limited basis," in the negotiations to acquire Duraco and testified, further, that Michael "sought out financing" for the acquisition on Kevin's behalf. (K. Lynch Dep. (2011) 10:9-16.) Michael never held an ownership stake in Duraco, however, nor was he a corporate officer. (K. Lynch Dep. (2011) 14:8-16.) According to Kevin Lynch, Michael did not keep a regular schedule at Duraco but was there on an "as-needed basis." (K. Lynch Dep. (2011) 23:14-17.) Michael Lynch had no authority to sign checks written on Duraco's operating account. (K. Lynch Dep. (2011) 42:19-22.)

Instead, Michael Lynch described his duties at Duraco as "higher level." (M. Lynch Dep. 92:3-4, 14.) Michael advised Kevin on matters ranging from "the digitalization of the technology" at the plant to the switch to a more affordable healthcare provider for Duraco employees. (M. Lynch Dep. 26:9-12, 125:18-126:6). Michael had both domestic and international responsibilities: he oversaw production at the plant, and he supervised the company's Canadian sales team. (M. Lynch Dep. 88:22-24.) Michael also negotiated financing agreements, managed the litigation aspects of Duraco's bankruptcy, evaluated temporary labor forces, and, on occasion, terminated an agreement with a staffing agency. (M. Lynch Dep. 38:5-15, 92:4-9.) He testified that supervisors Bill Sasser and John Cirillo "would report to [him] . . . on a daily basis" about the ongoing process of streamlining production. (M. Lynch Dep. 34:8-9, 37:2-14.) This chain of command is confirmed by an October 10, 2009 e-mail message that Michael Lynch wrote to Cirillo, with copies to Kevin Lynch and other personnel (Oct. 10, 2009 E-mail from Michael Lynch to John Cirillo, Ex. L to Pls.' 56.1, at 1), in which Michael reprimanded Cirillo for changing the production schedule without first obtaining his approval. (*Id.*) The message explained that the "chain of command is simple: Sasser reports to Cambra who reports to me (Michael Lynch)," and added that

14

neither Sasser nor Cirillo could make changes to production without Cambra's and his approval. (*Id.*)

At a minimum, therefore, the record establishes that Michael Lynch supervised mid-level managers like Cirillo and Sasser. What is less clear is Michael's level of interaction with and control over the work conditions of lower-tier employees such as Plaintiffs. With respect to Michael Lynch's oversight of employee shifts and schedules, Kevin Lynch testified that, "because we couldn't find anyone to drive production[,] . . . I really directed my brother to get in there and take charge and make sure shifts are running properly." (K. Lynch Dep. (2011) 111:24-112:13.) But there is little other evidence showing that Michael Lynch set employee work schedules or controlled the number of hours employees worked.

With respect to his involvement in payroll matters, Michael Lynch testified that he participated in plant-wide meetings with Kevin Lynch and the "senior management team," convened to discuss Duraco's financial difficulties.[11] (M. Lynch Dep. 60:18, 61:24-62:5.) Michael Lynch denied receiving e-mails from employees concerning their unpaid wages,[12] but acknowledged having "verbal communication" with employees about such matters "in the hallway or in an office or in the factory floor . . . ." (M. Lynch Dep. 76:16-77:1.) In January 2009, when a hospital declined to perform heart surgery on Duraco employee Roger Lindsey because of an alleged lack of coverage, Michael Lynch "picked up the phone and made sure that [the hospital] had evidence of

---

[11]     At his deposition, Michael Lynch did not identify any other members of the "senior management team" besides himself.

[12]     In support of their summary judgment motion, Plaintiffs submitted an e-mail message from Kimberly Cambra to Kevin and Michael Lynch, dated June 15, 2009, in which Cambra expressed her concern about "not getting paid," and stated that she "need[ed] to know when [she] will be paid." (June 15, 2009 E-mail from Kimberly Cambra to Kevin and Michael Lynch, Ex. S to Pls.' 56.1, at 2.) At his deposition, Michael Lynch testified that he did not recall receiving any such e-mail message from Cambra. (M. Lynch Dep. 77:17-20.) He also accused Cambra of having "overcompensated herself . . . [and of having] falsified her affidavit" (M. Lynch Dep. 80:15-18), but there is no evidence supporting these claims.

[Lindsey's] coverage." (M. Lynch Dep. 114:1-115:12.) Similarly, in October 2009, when Blue Cross/Blue Shield denied payment for a surgery that Duraco employee Bill Van Dusen underwent, Michael Lynch discussed the matter with Van Dusen and promised to "look into" it. (M. Lynch Dep. 106:21-107:15; Van Dusen Dep. 66:5-15.)

The parties also dispute whether Michael Lynch had the authority to hire or terminate employees. Kevin Lynch testified that Sasser and Cirillo had that authority (K. Lynch Dep. (2010) 13:7-9), but Sasser and Cirillo both reported to Michael Lynch; the natural inference, Plaintiffs argue, is that he too had that authority. (Pls.' 56.1 ¶ 13.) Plaintiffs also assert that Michael did terminate Duraco employee Patricia Seidl. (Pls.' 56.1 ¶ 14.) In support, they submit two pages of Seidl's deposition transcript in which Seidl stated that Michael Lynch "fire[d]" her in 2008. (Seidl Dep., Ex. I to Pls.' 56.1, 122:6-10.) But Michael Lynch denies terminating Siedl's employment; he testified that he asked her to leave the plant after he had a heated confrontation with Seidl's husband, Rudolph, who also worked at Duraco. (M. Lynch Dep. 120:16-122:5.) Specifically, Michael Lynch stated that, after Sasser ordered Rudolph Siedl to stay an additional two hours, Rudolph "went off using obscenities" and "threatened" Michael with a wrench. (M. Lynch Dep. 120:16-121:12.) The altercation prompted someone at Duraco to call the local police. (M. Lynch Dep. 121:12-15.)

At the time, Michael Lynch testified, he did not know that Rudolph and Patricia Seidl were married and he stated that he "would have used different language" had he known Rudolph's wife was present and observing the exchange. (M. Lynch Dep. 121:16-19.) Once the altercation had subsided, and Michael Lynch learned the Siedls were married, he put Rudolph on probation, and he "asked" or "suggested" that Patricia leave, but did not "instruct" her to do so. (M. Lynch Dep. 122:2-5;11-19.) He testified that he explained his reasoning to Patricia Seidl as follows: "Because this is not a professional environment and what you saw about—with your husband and myself was not appropriate professional behavior, and I think you should leave the environment because I don't

think this is good for you and your husband."  The only other evidence in the record concerning Michael Lynch's ability to make employment determinations is his brother Kevin's testimony that Michael was not "able to hire or fire anybody."  (K. Lynch Dep. (2010) 31:20-22.)

## DISCUSSION

Plaintiffs seek summary judgment on Defendants' liability for violating the FLSA, the IMWL, and the IWPCA; they do not now seek summary judgment on damages.  The court will grant a motion for summary judgment if, construing all facts in the light most favorable to the non-moving party, the moving party demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *Kellar v. Summit Seating Inc.*, 664 F.3d 169, 173 (7th Cir. 2011); FED. R. CIV. P. 56(a).  If the moving party adduces sufficient evidence to show it is entitled to summary judgment, the non-moving party must "affirmatively demonstrate, by producing evidence that is more than merely colorable, that there is a genuine issue for trial."  *Omnicare, Inc. v. UnitedHealth Group, Inc.*, 629 F.3d 697, 705 (7th Cir. 2011) (internal quotation marks and citation omitted).  "By its very terms, this standard provides that the mere existence of some alleged factual disputes between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

## I.    The Fair Labor Standards Act

Plaintiffs are protected by the provisions of the FLSA "if either the employer is a covered enterprise or the plaintiffs are covered individuals."  *Rivera v. Heights Landscaping, Inc.*, No. 03 C 6428, 2004 WL 434214 *1 (N.D. Ill. 2004) (citing *Tony and Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 295 n.8 (1985)).  The FLSA defines a covered enterprise as one that (1) "has employees engaged in commerce or in the production of goods for commerce, or that has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced by any person," and (2) has an "annual gross volume of sales made or business done

[that] is not less than $500,000." 29 U.S.C. § 203(s)(1)(A)(i)-(ii). Here, it is undisputed that Duraco used materials produced in interstate commerce in order to manufacture goods for distribution in interstate commerce, and that its annual gross sales in the years prior to its dissolution were in excess of $500,000. (Pls.' 56.1 ¶ 9.) Therefore, Duraco constitutes a "covered enterprise" under the FLSA and Duraco employees are protected by the FLSA.[13]

Defendants do not contest that Plaintiffs constitute "employees" under the FLSA, but they do, however, contest that they qualify as "employers." Under the FLSA, the term "employer" is defined as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). The FLSA contemplates the possibility that more than one "employer" may be responsible for FLSA compliance and thus, liable for FLSA violations. *See, e.g.*, *Falk v. Brennan*, 414 U.S, 190, 191 (1973) (FLSA action brought by the Secretary of Labor against a real estate management partnership and the individual partners). Moreover, the defendant may not always be a corporation: courts commonly find individual owners, officers, and managers of corporations to be "employers" under the FLSA ,and hold them personally liable for a corporation's failure to compensate its employees. *See, e.g.*, *Boucher v. Shaw*, 572 F.33 1087, 1093 (9th Cir. 2009) (holding that a corporation's bankruptcy has no effect on the managers' independent liability for FLSA violations); *Solis v. Int'l Detective & Protective Servs., Ltd.*, 819 F. Supp. 2d 740, 748 (N.D. Ill. 2011) (stating that "FLSA contemplates liability against not only the corporation owing the . . . compensation but also the individual corporate officers"); *see also* 29 C.F.R. § 825.104(d) (Department of Labor regulation stating that "[a]s under the FLSA, individuals such as corporate officers 'acting in the interest of an employer' are individually liable for any violations of the requirements of [the Family Medical Leave Act]").

---

[13]     Because the court finds that Duraco constitutes a "covered enterprise" under FLSA, it need not evaluate whether Plaintiffs, individually and independently, constitute "covered individuals."

In order to fulfill Congress's remedial intent in enacting FLSA , courts must broadly construe the terms "employer" and "employee." *Bastian v. Apartment Inv. and Mgmt. Co.*, No. 07 C 2069, 2008 WL 4671763 *2 (N.D. Ill. Oct. 21, 2008) (citing *Nationwide Mutual Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992)). Accordingly, courts have based the determination of whether a defendant is an "employer" on "the 'economic reality' of the working relationship." *Id.* (quoting *Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 33 (1961)). "In seeking to determine the economic reality of the nature of the working relationship, courts do not look to a particular isolated factor, but to all the circumstances of the work activity." *Sec'y of Labor v. Lauritzen*, 835 F.2d 1529, 1534 (7th Cir. 1987). In *Lauritzen*, the court noted six criteria that other Courts of Appeals have considered in determining whether an individual is an "employee."[14] The Seventh Circuit has not yet articulated corresponding criteria for identifying an "employer," but other courts have identified such factors as an individual's "significant ownership interests, day-to-day control of operations, and involvement in the supervision and payment of employees." *Solis*, 819 F. Supp. 2d at 748 (collecting cases). The focus of the economic realities test is on the totality of the circumstances, rather than on traditional labels and roles, and, to that end, no single factor is dispositive. *Villareal v. El Chile, Inc.*, 776 F. Supp. 2d 778, 789 (N.D. Ill. 2011).

Some authority suggests that the degree of control an individual defendant exerted over decisions that caused an FLSA violation is of particular significance in assessing the individual's potential liability as an "employer." *Villareal*, 776 F. Supp. 2d at 785 (citing *Dole v. Simpson*, 784 F. Supp. 538, 545 (S.D. Ill. 1991)) . Similarly, the Seventh Circuit stated, in dicta, that an

---

[14]    The six criteria noted are: "(1) the nature and degree of the alleged employer's control as to the manner in which the work is to be performed; (2) the alleged employee's opportunity for profit or loss depending upon his managerial skills; (3) the alleged employee's investment in equipment or materials required for his task, or his employment of workers; (4) whether the service rendered requires a special skill; (5) the degree of permanency and duration of the working relationship; [and] (6) the extent to which the service rendered is an integral part of the alleged employer's business." *Lauritzen*, 835 F.2d at 1535 (citations omitted).

employee of a defendant corporation may be deemed an "employer" under the FLSA "provided the defendant [employee] had supervisory authority over the complaining employee and was responsible in whole or part for the alleged violation." *Riordan v. Kempiners*, 831 F.2d 690, 694 (7th Cir. 1987) (citing 29 U.S.C. § 203(d)). Thus, Kevin or Michael Lynch may be "employers" and individually liable for FLSA violations, so long either of them exercised control over Plaintiffs and are at least partially to blame for the employment conditions that led to the alleged FLSA violations. The court now turns to whether Plaintiffs' allegations are supported by the evidence.

### A. Kevin Lynch

#### 1. "Employer"

Kevin Lynch contends that he cannot be considered an "employer" under the economic realities test because he was not involved in the daily operations of Duraco. (Defs.' Resp. at 4.) He claims that because Sasser and Cirillo had the authority to hire and fire, to grant raises, and to set schedules, and Dorothea Schmidt calculated employees' hours for payroll, he himself did not have sufficient control over Plaintiffs to be considered their "employer." (*Id.*) Kevin also claims to have had no control over any circumstances leading to the FLSA violations, because, in his view, Franklin "controlled all of Duraco's cash flow" and "tried to dictate Duraco's payroll priorities [by] telling Duraco to pay vendors before employees." (Defs.' Resp. at 4-5.) Thus, Kevin argues, he "lacked control over Duraco's finances and did not exercise day[-]to[-]day control over employees," and he cannot be deemed an "employer." (Defs.' Resp. at 5.)

The court disagrees. As the president and sole owner of Duraco, and the only signatory on Duraco's bank account, Kevin Lynch exercised more control over Duraco's finances than any other individual or entity. Kevin Lynch's assertion that "Franklin demonstrated control over Duraco's finances" (Defs.' Resp. at 5), but he did not, borders on the frivolous. Not only is there no evidence in the record corroborating Lynch's testimony that Franklin "dictate[d] who [he] should pay" (K. Lynch Dep. (2011) 109:7-11), the notion that a third party factoring company caused Duraco to

violate the FLSA strains credulity. Whatever Duraco's financial circumstances may have been, they do not excuse compliance with the FLSA. It was Kevin Lynch, not Franklin, who continued the day-to-day operations of the plant after it was apparent that Duraco employees could not count on receiving a steady paycheck. Had he, as president and owner of Duraco, suspended operations or reduced his work force to a size Duraco could afford, the FLSA violations may not have occurred. Franklin may have "tried to dictate Duraco's payroll priorities," but ultimately, those priorities were set by Kevin Lynch, not by Franklin. Franklin may also have attempted to pressure Kevin Lynch to pay vendors before his own employees, but no amount of third-party pressure relieves Kevin Lynch of his responsibility to meet his payroll.

The court also rejects Kevin Lynch's implicit argument that he can avoid his "employer" status by delegating tasks to mid-level supervisors and administrative employees. As Plaintiffs observe, "Defendants would seek to make employers out of clerical employees who input hours worked into a computer . . . rather than the main officers of a company." (Pls.' Reply [115] at 1.) The fact that Dorothea Schmidt engaged in the basic arithmetic and data entry necessary to process the checks does not mean she controlled Duraco's finances with respect to payroll. A delegation of authority does not equate to a complete abdication of that authority or of its corresponding responsibility. Plaintiffs need not show that Kevin Lynch personally supervised all aspects of Duraco operations at all times—surely an impossible task—in order to establish his "employer" status. "[S]uch status does not require continuous monitoring of employees, looking over their shoulders at all times, or any sort of absolute control of one's employees." *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999).

Even if the record does not include numerous, specific examples of Kevin Lynch exerting control over Plaintiffs or their paychecks, that does not negate his "employer" status. An infrequent exercise of control by an employer does not "diminish the significance of its existence." *Herman*, 172 F.3d at 139 (internal quotation marks and citations omitted). Kevin Lynch had the authority to

21

hire and fire, to adjust pay rates, and to approve vacation requests. (Answer ¶ 6; K. Lynch Dep. (2011) 105:4-11, 106:11-12, 120:18-23; *see also* K. Lynch Dep. (2010 ) 29:5-8.) Pro/Data printed his electronic signature on the payroll checks. (K. Lynch Dep. (2011) 80:22-81:3.) Kevin Lynch had to send an e-mail to Pro/Data granting "authorization" for Duraco employee Leslie Basely to have access to Duraco's payroll account. (July 11, 2008 E-Mail from Kevin Lynch to Sherry Ingram.) These facts demonstrate that, although Kevin Lynch may not have closely supervised the minutiae of the payroll processes or frequently wielded his authority over Plaintiffs, he was undoubtedly their "employer."

The one case Kevin Lynch relies on in support of his assertion that he is not an employer is easily distinguishable. In *Villareal v. El Chile, Inc.*, 776 F. Supp. 2d 778 (N.D. Ill. 2011), the court denied plaintiffs' motion for summary judgment on the individual defendants' status as employers, though it was undisputed that the individual defendants owned the corporation, and that one individual controlled the finances while the other supervised operations. *Villareal*, 776 F. Supp. 2d at 787. In that case, however, the individual defendants, married couple Timoteo and Maria Manjarrez, were far more removed from the daily operations of their four Chicago-based restaurants than Kevin Lynch is from Duraco: the Manjarrezes "resided in Mexico for a substantial portion of the class period." *Id.* at 781. They hired a general manager to be in charge of bookkeeping, payroll, making deposits to the corporate account, and calculating cash payment to employees. *Id.* at 782. Each restaurant had a kitchen manager and a dining room manager that could hire and fire, set schedules, and discipline employees. *Id.* The Manjarrezes claimed to have no knowledge of the employees' salaries or of any existing wage disputes. *Id.* at 788-89. The court based its denial of summary judgment on this issue on the assumption, necessarily drawn in favor of the nonmoving party, that the Manjarrezes "were not involved in the day-to-day decisions about the operation of the restaurants." *Id.* at 786.

That same assumption simply cannot be drawn in favor of Kevin Lynch. Kevin Lynch did

not loosely supervise Duraco from another country for any portion of the relevant time period; to the contrary, he was intimately involved in the daily operations of Duraco. He testified that "[e]arly on most of [his] time was spent at Duraco." (K. Lynch Dep. (2011) 24:16-18.) Even when Kevin Lynch was not at Duraco on a daily basis (K. Lynch Dep. (2011) 22:11-13), the various department heads at Duraco reported to him and, "[i]f they needed something . . . [he] was usually available." (K. Lynch Dep. (2011) 23:1-5.) More than any other individual, Kevin Lynch was well aware of Duraco's financial circumstances. He knew when the corporate account held insufficient funds to cover payroll and made the determination to withhold paychecks until a later date. (K. Lynch Dep. (2011) 82:7-11.) He held staff meetings in order to explain the financial troubles plaguing Duraco and he had private conversations with individual employees about their personal financial issues. (K. Lynch Dep. (2011) 90:12-15, 114:1-11, 114:20-115:17) In some cases, he wrote letters to employees' creditors explaining that the employees were in good standing and were owed back wages by Duraco. (Letters from Kevin Lynch to Kimberly Cambra's and Donna Magnuson's Creditors.) He maintained a spreadsheet of monies employees claimed they were owed by Duraco. (K. Lynch Dep. (2010) 69:4-16; *see also* Pre 11/18/08 Payroll Issues Spreadsheet.) In his own words, "[a]t the end of the day . . . it all came down on [Kevin Lynch's] desk"; he made "the final decisions." (K. Lynch Dep. (2010) 25:14-17; 26:17.) Kevin Lynch has failed to "produc[e] evidence that is more than merely colorable" in support of his argument that he is not an "employer" under the FLSA. His efforts to distance himself from the daily operation of Duraco are insufficient to defeat Plaintiffs' motion; the court grants summary judgment for Plaintiffs on Kevin Lynch's status as an "employer" under the FLSA.

### 2.    Liability

At the start of its liability analysis, the court notes that, in Defendants' response to summary judgment, Kevin Lynch did not argue that Plaintiffs were compensated for all due wages; he contested only his status as an "employer" and the evidentiary foundation for exhibits attached to

Plaintiffs' summary judgment motion. Plaintiffs, by contrast, have proffered enough evidence to establish that Kevin Lynch violated the FLSA by failing to fully compensate Plaintiffs, including: (1) payroll checks returned for insufficient funds (*see* Sampling of Returned Employee Checks); (2) bank statements showing numerous Duraco checks returned for insufficient funds (*see* American United Bank Statements); (3) a spreadsheet maintained by Kevin Lynch tracking the wages owed to Duraco employees (*see* Pre 11/18/08 Payroll Issues Spreadsheet); (4) written correspondence between Kevin Lynch and employees documenting their claims of unpaid wages (*see* Dec. 8, 2009 E-mail From Kimberly Cambra to Kevin and Michael Lynch; Dec. 6, 2009 E-mail from Donna Magnuson to Kevin and Michael Lynch); and (5) deposition testimony from a Duraco employee who quit because "[he] wasn't getting paid." (Van Dusen Dep. 65:23-24.)

Against this, Kevin Lynch offers virtually nothing. Plaintiffs have submitted a properly supported summary judgment motion, and now Defendants bear the burden of marshaling evidence that shows the existence of a genuine issue of fact for trial. *See Seng-Tiong Ho v. Taflove*, 648 F.3d 489, 496 (7th Cir. 2011) (citing *Anderson*, 477 U.S. at 250). Kevin Lynch has not attempted to establish, through personnel and payroll records, that any of the Plaintiffs were, in fact, fully compensated for any wages Duraco owed them. Only his May 2011 deposition testimony, and that of his brother Michael, are attached as exhibits to Defendants' response to summary judgment. Defendants' deposition testimony, however, is insufficient to thwart summary judgment, because it does not "set forth specific facts showing that there is a genuine issue for trial." *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003). Neither Kevin nor Michael Lynch proffer detailed, specific accounts of Duraco's payroll processes that create a genuine issue of fact regarding whether Plaintiffs were fully compensated; the record demonstrates that they were not.

Much of Defendants' testimony actually supports Plaintiffs' claims: Kevin Lynch repeatedly testified that during the last years of Duraco's existence, it often could not meet its payroll obligations in a timely matter. (*See, e.g.*, K. Lynch Dep. (2011) 68:8-19, 85:22-86:2, 88:4-6.) He

24

also admitted that he did not always check Duraco's bank account to ensure sufficient funds were present to cover payroll checks. (K. Lynch Dep. (2011) 84:1-4.) When Kevin Lynch instructed Cirillo and Sasser to withhold payroll checks because he knew there were insufficient funds in the operating account, he did not make any subsequent efforts to ensure that the checks were eventually disbursed and his employees were paid. (K. Lynch Dep. (2011) 93:16-20.)

Despite these admissions, Kevin Lynch testified that he "was under the assumption that [employees] were getting paid." (K. Lynch Dep. (2011) 73:1-2) (*see also* K. Lynch Dep. 85:9) ("I'm assuming eventually employees got paid.") Lynch's unsupported "assumption[s]" are insufficient to controvert Plaintiffs' evidence. The court's obligation to construe all facts in a light favorable to Kevin Lynch "does not relieve [him] of the obligation to do more than simply show that there is some metaphysical doubt as to the material facts." *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) (internal quotation marks and citations omitted). No reasonable jury could find that Plaintiffs were fully compensated for their earned wages. Therefore, the court grants summary judgment against Kevin Lynch on Plaintiffs' FLSA claim based on unpaid wages (Count I). Though Plaintiffs may ultimately carry the day on their FLSA claims for overtime wages (Count II) as well, there is currently insufficient evidence in the record that Duraco failed to pay overtime wages, specifically. This lack of evidentiary support requires the court to deny summary judgment on that claim at this time.

**B.     Michael Lynch**

**1.      "Employer"**

Whether Michael Lynch constitutes an "employer" under the FLSA is less obvious. Plaintiffs argue that Michael Lynch is an employer because he (1) "was at the top of the chain of command" at Duraco; (2) had authority to terminate employees; (3) was responsible for nonpayment of wages because he advised Kevin Lynch "to focus on production by keeping the customers happy"; (4) communicated with employees regarding their payroll issues; (5) spearheaded the search for

a new factoring company; (6) oversaw the employee health insurance program; and (7) had the authority to "make capital expenditures from Duraco's checking accounts." (Pls.' Mem. in Supp. of Their Mot. for Summ. J. [108] at 12-14.) Thus, Plaintiffs assert, Michael Lynch had control over the employment conditions that ultimately led to the alleged FLSA violations.

But Plaintiffs overstate the weight of the evidence currently in the record and supporting their factual allegations against Michael Lynch. In an October 12, 2009 e-mail, Michael Lynch did identify his place at the top of the "chain of command," but the content of that messages related to Duraco's "production schedule," not to employees' hours or wages. (Oct. 12, 2009 E-Mail from Michael Lynch to John Cirillo.) Michael Lynch admitted that it was his responsibility to "oversee[ ] production at the plant" (M. Lynch Dep. 88:22-23), and that duty may have included some supervision of Plaintiffs. He testified, however, that because of his business acumen, his duties were of a "higher level" than those of supervisors Cirillo and Sasser, who Michael Lynch believed to be in charge of the "day[-]to[-]day issues" like payroll disputes. (M. Lynch Dep. 91:20-92:13.)

Plaintiffs cite Michael Lynch's termination of Patricia Seidl's employment as proof of his control over Duraco employees, but the evidence in the record regarding that incident is disputed. Plaintiffs have submitted nothing more than Patricia Seidl's deposition testimony that Michael "fire[d]" her in 2008 (Siedl Dep. 122:6-10); any testimony that may have explained the circumstances of that termination was not submitted to the court. For his part, Michael Lynch testified that he did not fire Patricia Seidl, but simply sent her home after he engaged in a heated altercation with her husband Rudolph. (M. Lynch Dep.120:16-122:5.) The record contains no personnel records regarding Patricia Seidl's alleged termination or any other deposition testimony from other parties or witnesses to the factory floor altercation. Nor does there appear to be any other evidence of Michael Lynch hiring or dismissing any other employees. Plaintiffs note that Michael Lynch supervised Cirillo and Sasser, who had the authority to hire and terminate employees, but that tenuous link alone is insufficient to prove Michael Lynch had that same

26

authority on summary judgment.  On this record, the court is unable to be certain that Michael Lynch had the authority to make employment determinations or that he exerted control over employees' work schedules, employment conditions, pay scale, or employment records.

Plaintiffs argue that, even if Michael Lynch did not set work schedules, he was nevertheless responsible for nonpayment of wages, because, when Duraco had insufficient funds to make payroll and pay vendors, he advised Kevin Lynch "to just keep focusing" and to "[k]eep the customers happy."  (Pls.' Mem. at 12; *see also* K. Lynch Dep. (2010) 31:4-14.)  Because of this advice, Plaintiffs argue, Duraco unreasonably continued its operations even when it was unable to compensate its employees, and that "the *decision* to keep a failing business in operation" constitutes the sort of "financial control" that demonstrates an individual's status as an employer. (Pls.' Mem. at 12) (citing *Dole*, 784 F. Supp. at 545-46) (Tinder, J.) (emphasis added).  But there is slim evidence demonstrating that Michael Lynch *decided* to keep Duraco in operation.  In *Dole*, the individual defendant argued he was not an "employer" even though he was the controlling shareholder and the president (at least until shortly before the corporation's dissolution), and he personally bankrolled the foundering corporation.  784 F. Supp. at 541-43.  Judge Tinder denied defendant's motion for summary judgment, because the record "indicate[d] that no substantive decisions were made without [the defendant's] approval."  784 F. Supp. at 546.  In this case, by contrast, the record shows that Michael Lynch counseled his brother and Duraco President Kevin Lynch on "substantive decisions," but he did not, himself, decide "to keep a failing business in operation."  Moreover, Plaintiffs' assertion that Michael Lynch had the authority to make capital expenditures from Duraco's checking account has virtually no support in the record.[15]  Michael

---

[15]     In support of this assertion, Plaintiffs cite to one page of Michael Lynch's deposition testimony in which he flatly denies having "signature authority" on Duraco checking accounts at American United Bank, J.P. Morgan Chase, and Suburban National Bank.  (M. Lynch Dep. 42:2-12.)  When asked if Kevin Lynch ever gave him "the account information" so that he could pay vendors, Michael Lynch replied that he "had access to that information in data," but that he didn't

(continued...)

Lynch was certainly aware of Duraco's precarious financial situation, but Plaintiffs have not shown that he had the decision-making power to lay off employees, to shut down the plant, or otherwise to exercise control over the conditions that led to the FLSA violations.

Unlike the defendant in *Dole*, Michael Lynch was neither an owner nor officer of Duraco. Though Plaintiffs rightly observe that the focus of the economic realities test is not on financial interests and formal titles, an individual's official capacity within the company and his or her personal financial stake in its success are highly relevant to determining that individual's degree of control over and responsibility for the alleged FLSA violations. Moreover, while evidence in *Dole* showed the defendant decided "[w]ho to pay[,] [w]ho not to pay . . . [w]ho to fire[,] [w]ho to hire," *Dole*, F. Supp. at 542, Plaintiffs have not shown that Michael Lynch similarly controlled payroll decisions at Duraco. Ultimately, Michael Lynch's decision-making authority is very much in dispute: he did spearhead the search for a new factoring company and for a more cost-effective employee health insurance program, but the record suggests that responsibility for all "final decisions" lay with Kevin Lynch. (*See, e.g.*, K. Lynch Dep. (2010) 26:17.) Examining the totality of the circumstances, the court finds that a genuine issue of material fact remains regarding whether Michael Lynch "had supervisory authority over [Plaintiffs] and was responsible in whole or part for the alleged violation[s]." Plaintiffs' motion for summary judgment against Michael Lynch is denied.

## II. The IMWL Claims

The court's analysis of Plaintiffs' FLSA claims similarly applies to Plaintiffs' IMWL claims, because the two statutes are substantively congruent. *See, e.g.*, *Condo v. Sysco Corp.*, 1 F.3d 599, 601 n.3 (7th Cir. 1993) (applying the same analysis to the plaintiff's FLSA and IMWL claims for unpaid overtime wages); *see also Ladegaard v. Hard Rock Concrete Cutters, Inc.*,

---

[15](...continued)
use it. It is not clear to the court that having "access" to information is tantamount to having authority to expend. (M. Lynch Dep. 42:16-20.) There is no other evidence in the record of Michael Lynch authorizing expenditures from any Duraco account.

No. 00 C 5755, 2004 WL 1882449 *4 (N.D. Ill. Aug. 18, 2004) (stating that "[c]ourts have generally held that the IMWL parallels the FLSA") (collecting cases). Therefore, the court grants summary judgment against Kevin Lynch on Plaintiffs' IMWL claim for unpaid minimum wages (Count III), but denies summary judgment on Plaintiffs' IMWL claim for unpaid overtime wages (Count IV) for the same reasons described above. With respect to all claims against Michael Lynch, the court denies summary judgment, because a genuine issue of material fact remains as to his status as an "employer."

### III.    The IWPCA Claims

The court's analysis under the IWPCA is somewhat different yet yields essentially the same result. The IWPCA requires that "[a]ll wages earned by an employee during a semi-monthly or bi-weekly pay period shall be paid to such employee not later than 13 days after the end of the pay period in which such wages were earned." 820 ILCS 115/4. Adopting language from the FLSA, the IWPCA defines the term "employer" as including "any person or group of persons acting directly or indirectly in the interest of an employer in relation to an employee." 820 ILCS 115/2. According to the Illinois Supreme Court, however, there is no need to apply the economic realities test to determine who constitutes an employer under the IWPCA, because, unlike the FLSA, the IWPCA expressly imposes liability on "those individual decision makers who knowingly permitted the Wage Act violation." *Andrews v. Kowa Printing Corp.*, 217 Ill.2d 101, 109, 111-12, 838 N.E.2d 894, 899-900, 901 (Ill. 2005); *see also* 820 ILCS 115/13 (stating that "employer" status "includes any officers of a corporation or agents of an employer who knowingly permit such employer to violate the provisions of [the IWPCA]").

The evidence that supports a liability finding on Plaintiffs' FLSA and IMWL claims also shows that Kevin Lynch "knowingly permit[ted]" Duraco to violate the IWPCA provision requiring payment of wages within thirteen days after the end of a pay period. There is no doubt that he was fully aware of Duraco's financial instability and that he decided to continue operations long after

repeated incidences in which Duraco did not pay Plaintiffs their due wages. Therefore, the court finds that he constitutes an "employer" under the IWPCA and grants summary judgment against him on the IWPCA claims for earned wages (Count V). The court denies, however, Plaintiffs' IWPCA claim for vacation pay (Count VI) because of the lack of evidence, at this time, showing the specific nonpayment of vacation wages. The court also denies both IWPCA claims against Michael Lynch, because, as explained above, a genuine issue of fact remains as to his status as an "employer."

## CONCLUSION

For the reasons explained herein, the court grants Plaintiffs' motion for summary judgment [107] against Defendant Kevin Lynch regarding his status as an "employer" under the FLSA and his liability on the claims for unpaid wages brought under the FLSA, the IMWL, and the IWPCA (Counts, I, III, and V), but the court denies summary judgment against Kevin Lynch on all other claims. As against Michael Lynch, summary judgment is denied.

ENTER:

Dated: September 6, 2012

_____

REBECCA R. PALLMEYER
United States District Judge