**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **MARIA ARTEAGA, OFELIA ARTEAGA,** | ) | |
| **MARIA AVINA, ROSA BRISEÑO,** | ) | |
| **KIMBERLY CAMBRA, JOSE DELGADO,** | ) | |
| **MIKE DICKEY, MARIA GONZALEZ,** | ) | |
| **BRYAN HODSON, ADALBERTO JIMENEZ,** | ) | |
| **MARIBEL JIMENEZ, GARY KRAMER,** | ) | |
| **MARIA MADRID A/K/A MARIA ZUÑIGA,** | ) | |
| **DONNA MAGNUSON, MONICA MARES,** | ) | |
| **PABLINO MARTINEZ, GUADALUPE MENDOZA,** | ) | |
| **SILVIA PEREZ, ROBIN RITCHEY,** | ) | |
| **BRENDA RODRIGUEZ, IRMA RODRIGUEZ,** | ) | |
| **JESENYA RODRIGUEZ, JUAN RODRIGUEZ,** | ) | |
| **DOROTHEA SCHMIDT, PATRICIA SEIDL,** | ) | **No. 10 C 1444** |
| **RUDOLPH SEIDL, KENNETH SOCKI,** | ) | |
| **WILLIAM VAN DUSEN, MARIA VAZQUEZ,** | ) | **Judge Rebecca R. Pallmeyer** |
| **FELIPE ZUNIGA, CHARMAINE SCHALLMO,** | ) | |
| **MARGARET LORDAN, AGATA TOMAS,** | ) | |
| **and PATRICK BACA,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **KEVIN LYNCH and MICHAEL LYNCH,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Until 2010, Plaintiffs worked for Duraco Products, Inc., a plastics manufacturer in Streamwood, Illinois. After the plant closed and Duraco sought bankruptcy protection, Plaintiffs brought this action against Defendants Kevin Lynch, Duraco's president and sole owner, and Kevin Lynch's brother Michael, who assisted with managing the business. Plaintiffs seek unpaid wages and damages under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*; the Illinois Minimum Wage Law ("IMWL"), 820 ILCS 105/1 *et seq.*; and the Illinois Wage Payment and Collection Act ("IWPCA"), 820 ILCS 115/1 *et seq.* Last year, the court entered summary judgment on liability in favor of Plaintiffs and against Kevin Lynch. *Arteaga v. Lynch*, No. 10 C 1444, 2012

WL 3879899 (N.D. Ill. Sept. 6, 2012). Plaintiffs now seek summary judgment against Defendant Michael Lynch as well, urging that there are no disputes of fact concerning Michael Lynch's liability for unpaid wages. Plaintiffs ask this court for an Order of Judgment in the amount of $395,234.40 against Kevin and Michael Lynch. For the reasons stated herein, the motion is granted.

## FACTUAL BACKGROUND

Duraco was a plastic injection molding facility that manufactured and sold plastic plant containers. (Kevin Lynch Deposition [118] at 5-6.) Kevin Lynch purchased Duraco in May 2007 and became its president and Chief Operating Officer. (*Id.* at 9; Kevin Lynch Affidavit, Ex. A to Michael Lynch's Response in Opposition to Plaintiff's Motion for Summary Judgment [134-1] ¶ 1.) Michael Lynch was assistant to his brother, Kevin Lynch, and was responsible for strategic planning. (Kevin Lynch Dep. [118] at 9-10; Michael Lynch Answers to Plaintiff's Interrogatories, Ex. D to Pl.'s 56.1 ("hereinafter, "M. Lynch Interrogatories") [109-1] at 1.) Duraco filed for Chapter 11 bankruptcy on November 18, 2008. (Plaintiffs' Motion for Entry of an Order of Judgment against Michael Lynch (hereinafter, "Michael Lynch Motion") [126] at 2.)

**Unpaid Wages**

Beginning no later than 2008, Duraco struggled to meet its payroll obligations. Citing, among other things, copies of checks returned for insufficient funds, Plaintiffs assert that Duraco first failed to make full payment of wages to its employees in March 2008. (Pls.' 56.1 [109] ¶ 28; Sampling of Returned Paychecks, Ex. O to Pl.'s 56.1 [109-2].) Kevin Lynch acknowledged there were months during which checks were issued to employees even though Duraco's operations account did not have sufficient funds to honor those checks. (Kevin Lynch Dep. [118] at 87.) In fact, Kevin Lynch "[knew] for certain May—May, June, and July, [he] wasn't able to really pay anybody." (*Id.* at 36.) Kevin Lynch admitted, further, that "when we didn't hand out payroll checks, those checks that should have gone out were put aside." (Kevin Lynch 2010 Deposition, Ex. G to

2

Pls.' 56.1 [109-1] at 52.)  Plaintiffs have submitted copies of a number of employee paychecks they describe as "undisbursed" (that is, as the court understands it, written to employees but never distributed to them).  (Sampling of Undisbursed Employee Checks, Ex. P to Pls.' 56.1 [109-2].)  In addition, the Plaintiffs have submitted spreadsheets on which Kevin Lynch recorded "what employees told [him] they were owed." (Kevin Lynch 2010 Dep. [109-1] at 69; Spreadsheets, Ex. R to Pls.' 56.1 [109-3].)  The spreadsheets, labeled "pre 11/18/08 payroll issues" and "checks not received," list thirty-one employees who reported being owed money by Duraco, and include individual entries for each paycheck that was returned for insufficient funds or never received in the first place.  *Id.*

William Sasser worked as Duraco's plant manager from January 2009 until the plant closed in February 2010, reporting directly to Michael Lynch.  (Sasser Aff., Ex. A to Michael Lynch Motion [128-1], at ¶¶ 2, 4; M. Lynch Interrogatories [109-1] ¶ 6b.)  Duraco was in bankruptcy proceedings during the time Mr. Sasser was employed, and he acknowledged that Duraco was "often unable to meet their payroll obligations to the employees of Duraco." (Sasser Aff. [128-1] ¶ 6.)  On payday, he recalled, "dozens of production workers would come to [his] office" to ask whether they would be paid that week.  (*Id.* ¶ 7.)  In several instances, Kevin Lynch wrote letters on behalf of Duraco employees who were struggling to pay their own bills because of the missed paychecks, attesting to the fact that the employees were working and promising that they would be paid soon. For example, on December 7, 2009, Kevin Lynch wrote a letter on behalf of Kimberly Cambra, an employee of Duraco, requesting that her late mortgage payment be forgiven.  (Letter for Cambra, Ex. C to Pls.' Local Rule 56.1(B)(3)(b) Reply to Defs.' Statement of Additional Facts in Opposition to Michael Lynch Motion (hereinafter "Pl.'s M. Lynch Reply") [138-1].)  The letter confirms that Cambra was employed by Duraco and attributes Cambra's late mortgage payment to the fact that Duraco was several weeks behind in paying her.  *Id.*  The letter states that "Duraco intends to make good on those checks in the forthcoming weeks."  *Id.*  A notation on the letter shows that Michael

3

Lynch received a copy. *Id.* Kevin Lynch also wrote a letter dated December 30, 2009 on behalf of Donna Magnuson to her current creditors. (Letter for Magnuson, Ex. C to Pls.' M. Lynch Reply [138-1].) This letter states, "Donna J. Magnuson is owed money by Duraco for several payroll periods. It is the intent of Duraco to bring Donna J. Magnuson current with payroll by the end of January, 2010." *Id.* As noted, Plaintiffs have also presented copies of a large number of paychecks that were returned for insufficient funds. (Ex. O to Pls.' 56.1 [109-2].)

**Blue Cross Blue Shield Insurance**

Duraco's financial difficulties also affected the Plaintiffs' health insurance coverage. Starting around August of 2009, Duraco stopped making payments to Blue Cross Blue Shield ("BCBS") for the insurance deductions taken from employee's paychecks. (Kevin Lynch Dep. [118] at 128.) BCBS billing statements from July 17, 2009 to November 30, 2009 show that Duraco's payments were past due. (BCBS Billing, Ex. Z to Pls.' 56.1 [109-3].) Michael Lynch testified that Duraco "held up payments" to BCBS for a period of time because Duraco's insurance agent, Tom Terrell, advised that there was a credit on Duraco's account with BCBS. (Michael Lynch Dep. [119] at 105.) It appears BCBS did not agree: Health care providers stopped providing care for some employees because the insurer refused to cover employee medical expenses. (Phone message, Ex. W to Pls.' 56.1 [109-3]) (copy of a January 30, 2009 phone message for Michael Lynch stating, "insurance is stopping [the employee] from having heart surgery").) In October 2009, Plaintiff William Van Dusen spoke with Kevin Lynch about medical bills that were not covered by his group health insurance because the premiums had not been paid by Duraco. (Van Dusen Dep., Ex. V to Pls.' 56.1 [109-3] at 67.) At Kevin Lynch's direction, Van Dusen spoke with Michael Lynch about the matter several times between October and December 2009, and Michael Lynch reassured him that "everything would be okay." *Id.* On January 18, 2010, Van Dusen wrote an e-mail message to Kevin Lynch, Michael Lynch, and Dorothea Schmidt, requesting that Duraco "stop deducting

4

money for health insurance" from his wages. (E-mail from Van Dusen, Ex. AA to Pls.' 56.1 [109-3]; Van Dusen Dep. [109-3] at 65.)

**Michael Lynch's Role**

Michael Lynch's role in the company is disputed. As noted, Michael Lynch was the assistant to Kevin Lynch and in charge of strategic planning. (M. Lynch Interrogatories [109-1] ¶ 1.) In his deposition, Kevin Lynch described Michael Lynch as playing a "consulting" role in the company, advising Kevin Lynch on production issues, employee disputes, and financing matters. (Kevin Lynch 2010 Dep., Ex. G to Pls.' 56.1 [109-1] at 29-31.) In 2007, Kevin Lynch entered into a factoring agreement, on Duraco's behalf, with Franklin Capital Corporation ("Franklin"). (Kevin Lynch Dep. [118] at 50, Factoring Agreement, Ex. N to Pls.' 56.1 [109-2].) The factoring agreement was a financing arrangement under which Franklin purchased Duraco's accounts receivable at a discounted rate, advanced to Duraco 80% of the amount owed on each invoice, then collected the invoice in full and paid Duraco the remaining 20%, less interest and Franklin's fees. (Kevin Lynch Dep. [118] at 49-50.) According to Kevin Lynch, however, Franklin "never honored [the] agreement." (*Id.* at 52.) Kevin Lynch testified that when, "three or four months into ownership," he realized that Franklin was routinely underfunding Duraco, the relationship between Duraco and Franklin devolved into a "fight" that ultimately resulted in Duraco's hiring an accounting firm to conduct a forensic accounting of Franklin's records, terminating the agreement with Franklin, and entering into a substitute factoring agreement with Bibby Financial Services ("Bibby"). (*Id.* at 50, 53.)

Kevin Lynch testified that while working for Duraco, Michael Lynch never held an ownership stake or a corporate office and did not maintain a regular schedule, instead appearing "[o]n an as-needed basis." [Kevin Lynch Dep. [118] at 14, 23.) Michael explained that he was instructed to work "at a higher level" than day-to-day management of employee activity. Instead, he "negotiated

financing with Bibby, making sure the financial deals were complete in bankruptcy court, dealing with the bankruptcy attorneys . . . ."  (Michael Lynch Dep. [119] at 92.)  Michael had both domestic and international responsibilities; he oversaw production at the plant, and he supervised the company's Canadian sales team.  (*Id.* at 88.)  Though Michael was not a signatory and could not write checks from Duraco's bank account, he did have access to Duraco's bank account information.  (*Id.* at 42.) Michael Lynch was also responsible for insurance management.  He acknowledged that Kevin Lynch directed him to "make sure there were no issues with Blue Cross Blue Shield."  (Michael Lynch Dep. [119] at 101.)    In that role, Michael Lynch was aware that Duraco had "held up payments" to BCBS on the advice of Duraco's insurance agent, Tom Terrell, who reportedly discovered that BCBS had charged Duraco a premium for some employees who had "dropped off" and recommended that Duraco engage in self-help by holding back payments.  (*Id.* at 105.)  What resulted from that decision was "some destructive discourse," but BCBS and Terrell eventually reached a resolution.  (*Id.*)  It was Michael Lynch who was the contact person for employees having trouble with their insurance.  (Van Dusen Dep. [109-3] at 67.)

Michael also evaluated whether temporary labor forces were necessary, and, on occasion, terminated an agreement with a staffing agency.  (Michael Lynch Dep. [119] at 38.) Kevin Lynch instructed Michael to focus on the "right sizing of the plant," bringing in new equipment, "reducing the work force," and making the work force more flexible, so that workers could move "from production to shipping and packing."  (*Id.* at 37.)  Supervisors Bill Sasser and John Cirillo "would report to [Michael Lynch] . . . on a daily basis" about the ongoing process of streamlining production.  (*Id.* at 34, 37; M. Lynch Interrogatories [109-1] ¶ 6.)  According to Mr. Sasser, the general manager, Michael Lynch "provided [him] with instructions on a daily basis."  (Sasser Aff. [128-1] ¶ 4.)  And Duraco's employees understood Kevin and Michael Lynch to be in charge. (Maria Arteaga Dep., Ex. K to Pls.' 56.1 [109-2] at 11; Ofelia Arteaga Dep., Ex. J to Pls.' 56.1 [109-2] at 12.)

6

Michael Lynch's involvement in payroll decisions is also disputed. Defendants contend that Michael Lynch had no control over whether payroll would be funded because, in their view, the matter was outside Duraco's control. The power to make those decisions, they contend, "was held by Franklin Capital." (Michael Lynch Response [135] at 2; Kevin Lynch Aff., Ex. A to Michael Lynch Response [135-1] ¶ 6.) Michael Lynch acknowledged, however, that he participated in plant-wide meetings with Kevin Lynch and employees to discuss Duraco's financial difficulties. (Michael Lynch Dep. [119] at 60-62.) Michael Lynch also discussed payroll concerns with employees on the plant floor. (*Id.* at 73.) When employees complained about delayed payments, Michael Lynch made the employees aware of the "issue with Franklin," assuring them that he believed that "not only would everyone get paid in full, but we will be exiting the bankruptcy, and it will be a viable company going forward." *Id.* When employees asked Mr. Sasser, the general manager, whether they would be paid, Mr. Sasser would consult with Michael Lynch about how to respond; when the employees were not to be paid, Michael Lynch would instruct William Sasser to tell the workers that "they would be paid on a later date" and that "he, Michael, and Kevin Lynch would 'make good' on the owed payroll." (Sasser Aff. [128-1] ¶¶ 8-10.) Plaintiffs assert that Michael Lynch repeatedly encouraged employees to continue working on the understanding that their wages would be paid in the future. (Michael Lynch Motion [128] at 2, citing Sasser Aff. [128-1] ¶¶ 7-10.)

The parties also disagree about Michael Lynch's involvement in the production work schedule. Plaintiffs assert, again citing William Sasser's affidavit, that Michael Lynch set the employee work schedules and exercised authority to change the work schedule either by directly telling employees or through Sasser. (Sasser Aff. [128-1] ¶ 11.) In an e-mail message from Michael Lynch to John Cirillo on October 12, 2009 at 10:09 am, Michael Lynch criticized Mr. Cirillo for making "a change in the production schedule without [Kim Cambra's] approval." (E-mail message, Ex. A to Plaintiffs' Reply in Support of Michael Lynch Motion [138-1].) Michael Lynch wrote, "The chain of command is simple: Sasser reports to Cambra, who reports to me. Once the

7

schedule is set, it only changes if Kim comes to me for approval of the change. Sasser, Socki or you cannot make those changes without Kim's approval who in turn must seek approval from me." (*Id.*) William Sasser noted that Michael Lynch would instruct him to direct the production employees to "come in on weekends and stay late" to meet production quotas. (Sasser Aff. [128-1] ¶ 12.)

Michael Lynch nevertheless denies that he had responsibility for the employees' work schedule. He insists that he did not schedule the staffing of hourly employees and that those responsibilities were assigned to William Sasser and Kenneth Socki. (Michael Lynch Response [135] at 2; Kevin Lynch Aff. [135-1] ¶¶ 3-4.) Defendants explained that Duraco operated using two shifts; the job of preparing the schedule for the first shift was assigned to Bill Sasser, and Ken Socki was assigned to schedule the second shift. (Kevin Lynch Aff. [135-1] ¶ 3.) Plaintiffs acknowledge that Mr. Sasser and Mr. Socki prepared work schedules, but insist, citing the October 12, 2009 e-mail message, that Michael Lynch exercised authority to make unilateral changes.

Whether Michael Lynch had the authority to hire or fire employees is similarly disputed. Kevin Lynch says he did not (Kevin Lynch Aff. [135-1] ¶ 5; Kevin Lynch 2010 Dep. [109-1] at 31), but William Sasser stated that Michael Lynch did have that authority and in fact "periodically informed [Sasser] of having fired employees." (Sasser Aff. [128-1] ¶ 14.) It is uncontested that John Cirillo, Bill Sasser, and Ken Socki could hire employees, and that Sasser and Cirillo reported to Michael Lynch and were under Michael Lynch's control. (Michael Lynch Dep. [119] at 34-35.) Plaintiffs also note the testimony of Patricia Seidl that Michael Lynch "fire[d] her in 2008." (Pls.' 56.1 [109] ¶ 14; Patricia Seidl Deposition, Ex. I to Pls.' 56.1 [109-1] at 46.) Michael Lynch denies terminating Seidl's employment; he asserts that he merely asked her to leave after an altercation with her husband Rudy Seidl, who also worked at Duraco. (Michael Lynch Dep. [119] at 120-22.) Notably, Michael Lynch acknowledges that, as William Sasser recounted, Michael Lynch did threaten to fire Patricia's husband Rudy Seidl. (Michael Lynch Resp. [135] at 2; Sasser Aff. [128-1]

8

¶ 15.) According to Defendant, William Sasser asked Rudy Siedl to work two extra hours to change the molding on Duraco's injection molding machine and Rudy Siedl responded to the request by pulling out a large socket wrench and threatening to hit Michael Lynch in the head. (Michael Lynch Response [135] at 2.) In Plaintiffs' version of events, Michael Lynch threatened to fire Rudy Seidl if Rudy refused to work past his regular shift to meet the production quota. (Sasser Aff. [128-1] ¶ 15.)

**Amount of Unpaid Wages**

The amounts of unpaid wages still due to the Plaintiffs are also disputed. Plaintiffs' original request was for $412,731.43 in unpaid compensation, but the Defendants contend that amount is largely overstated and Plaintiffs have reduced it in response to certain of Defendants' objections. As an exhibit to their Motion for Entry of an Order of Judgment [126], Plaintiffs have submitted a spreadsheet setting forth their calculations, based on payroll records, bank records, and affidavits. (Spreadsheet of Wages Owed, Ex. D to Plaintiffs' Motion for Entry of an Order of Judgment [126-1].) Plaintiffs relied on similar calculations in support of their claim in the bankruptcy proceedings for Duraco. (See Amended Motion of Employees of Duraco for Allowance of Admin. Expense Claim ¶ 9, *In re Duraco Products, Inc.*, 08-B-31353 (Docket No. 782).) On December 1, 2010, Judge Wedoff of the Bankruptcy Court approved an administrative expense claim against Duraco in the amount of $394,553.60. (Order Allowing Administrative Expense, Ex. A to Plaintiffs' Motion for Entry of an Order of Judgment [126-1].)

In addition to the information they presented to the bankruptcy court, the spreadsheet submitted in this case includes calculation of liquidated damages, vacation, and unlawful insurance premium wages. (Spreadsheet [126-1].) The total amounts owed to each Plaintiff range from $1,008.70 to $59,171.22: thirteen Plaintiffs claim amounts less than $10,000; twelve claim amounts between $10,000 and $20,000; and five Plaintiffs claim amounts greater than $20,000. Plaintiffs

also seek unpaid wages for Jose Delgado, whose claim was not part of the bankruptcy filing; Delgado claims he is entitled to $6,153.60 for six weeks of work as a warehouse forklift driver for which he was not paid in 2009. (Plaintiffs' Motion for Entry of an Order of Judgment [126-1] ¶ 11; Delgado Affidavit, Ex. B to Plaintiffs' Motion for Entry of an Order of Judgment [126-1] ¶¶ 4-9.) Mr. Delgado's claim is supported by his affidavit listing weeks of work for which he was not paid, as well as payroll and bank records. (*Id.*) In addition, Plaintiffs seek recovery of health insurance premium amounts that were deducted from the wages of Plaintiff Brian Hodson and the salaries of Kenneth Socki, Donna Magnuson, and William Van Dusen. but never remitted to Duraco's insurance carrier. (Plaintiffs' Motion for Entry of an Order of Judgment [126] ¶ 13.)

Defendants contend the amounts Plaintiffs claim are overstated because some of the claimed wages were in fact paid by wire transfers, and because Plaintiffs have not accounted for certain cleared checks. (Kevin Lynch Aff, Ex. A to Kevin Lynch's Response to Plaintiffs' Motion for Entry of an Order of Judgment [134-1], ¶¶ 3-7).) Defendants also challenge Kimberly Cambra's claim for 390 hours of unpaid overtime, asserting that Ms. Cambra did not work overtime. (Kevin Lynch Affidavit [134-1] ¶ 7.) Kevin Lynch's affidavit claims he is "knowledgeable" about certain payments, but neither Defendants nor Plaintiffs have presented the bank records themselves. Instead, Plaintiffs rely on the motion submitted to the bankruptcy court in the Duraco Products bankruptcy, which includes, as support, affidavits, and an Excel spreadsheet listing check numbers.

**Duraco's Payroll Policies**

Yet another dispute concerns the amount of overtime and double-time worked by the Plaintiffs. Employees were required to clock in to receive credit for hours worked. (M. Lynch Interrogatories [109-1] ¶ 9.) Duraco's payroll manager, Dorothea Schmidt, was responsible to collect the records, record the information in Duraco's payrolls system, and forward it to a vendor for the issuance of payroll checks. (Kevin Lynch Dep. [118] at 80.) Defendants assert that

Plaintiffs are making false claims for overtime pay, but Plaintiffs insist they in fact worked hours on weekends or after hours for which they are entitled to overtime wages. (Kevin Lynch Aff. [134-1] ¶ 12; Spreadsheet, Ex. B to Plaintiffs' Reply [137-1].) Plaintiffs note the evidence that Michael Lynch would instruct the general manager to direct production employees to "come in on weekends and stay late" to meet production quotas, even during times that Duraco was unable to make payroll. (Sasser Aff. [128-1] ¶ 12.) Ofelia Arteaga confirmed that Kevin Lynch asked her to "stay working . . . for extra hours." (Ofelia Arteaga Dep., Ex. J to Pls.' 56.1 [109-2], at 12.) The amount of the overtime claimed is also disputed. Defendants contend that Duraco's pay policy required that, before an employee could collect overtime pay, he or she had to work a full forty-hour week, and that Plaintiffs' claims include overtime during weeks in which they did not reach that threshold. (Kevin Lynch Affidavit [134-1] ¶ 10.) Defendants contend, further, that Duraco's policy did not provide for double-time pay (*id.* ¶ 11); but as Plaintiffs note, paystubs for Juan Rodriguez and a payroll document for Rosa M. Briseno, both dated February 2009, list "Double Time" under the category of "Earnings," and set forth amounts earned. (Paystubs, Ex. C to Plaintiffs' Reply [137-1].)

Defendants blame Duraco's payroll manager, Dorothea Schmidt, for awarding pay increases, changing pay rates, and authorizing holiday and overtime pay. (Kevin Lynch Affidavit [134-1] ¶ 8.) They assert that Schmidt manipulated Plaintiffs' hourly rates without authorization, and that before she took on the payroll responsibilities, Duraco employees received holiday pay only on Christmas Day and New Year's Day, and only if those holidays occurred on a work day. (*Id.* ¶¶ 9, 15.) Defendants now note that Dorothea Schmidt provided for unauthorized holiday pay for herself and others for Easter Sunday 2009. (*Id.* ¶ 9.)

11

**Bankruptcy Proceeding**

Duraco's Chapter 11 proceeding was involuntarily converted into a Chapter 7 bankruptcy on February 17, 2010. (Plaintiffs' Motion for Entry of an Order of Judgment [126] ¶ 5.) As noted, the bankruptcy court awarded Plaintiffs $394,553.60 as an administrative expense against the estate. (Order Allowing Administrative Expense, Ex. A to Plaintiffs' Motion for Entry of an Order of Judgment [126-1].)

<u>**DISCUSSION**</u>

Plaintiffs seek summary judgment for $395,234.40 in damages under the FLSA and summary judgment as to Michael Lynch's status as an employer. On this motion, Plaintiffs, who seek judgment in their favor, bear the initial burden of showing that there is "no genuine dispute as to any material fact." FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Insolia v. Philip Morris Inc.,* 216 F.3d 596, 598 (7th Cir. 2000). Once the moving party has met its burden, the non-moving party must set forth specific facts showing that there is a genuine issue for trial. FED. R. CIV. P. 56(e); see *Smith v. Shawnee Library Sys.*, 60 F.3d 317, 320 (7th Cir.1995) (the non-moving party "must come forward with evidence of a genuine factual dispute"). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The court will grant a motion for summary judgment if, construing all facts in the light most favorable to the non-moving party, the moving party demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Kellar v. Summit Seating Inc.*, 664 F.3d 169, 173 (7th Cir. 2011).

**I.      Fair Labor Standards Act**

To prevail under the Fair Labor Standards Act, an employee must present evidence that he has "in fact performed work for which he was improperly compensated" and to show "the

amount and extent of that work as a matter of just and reasonable inference." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946). The burden to prove the specific amounts owed, however, should not be an "impossible hurdle." Instead, in order to fulfill the "remedial nature of this statute and the great public policy which it embodies," employees need not prove their damages with mathematical precision. *Id.* at 687. Pursuant to §11(c) of the FLSA, it is the employer who has the burden to keep records of hours and payment, not the employee. 29 U.S.C.A. § 211. The logic is simple; if the employer keeps proper records, he will be readily able to meet his burden by producing those records. *Anderson*, 328 U.S. at 687. In a situation in which the employer fails to keep the proper records, the consequences of the failure should not fall on the employee, but the employer. *Id.* As the *Anderson* Court explained:

> The employer cannot be heard to complain that the damages lack the exactness and precision of measurement that would be possible had he kept records in accordance with the requirements of 11(c) of the Act. And even where the lack of accurate records grows out of a bona fide mistake as to whether certain activities or non-activities constitute work, the employer, having received the benefits of such work, cannot object to the payment for the work on the most accurate basis possible under the circumstances. Nor is such a result to be condemned by the rule that precludes the recovery of uncertain and speculative damages. That rule applies only to situations where the fact of damage is itself uncertain. But here we are assuming that the employee has proved that he has performed work and has not been paid in accordance with the statute. The damage is therefore certain. The uncertainty lies only in the amount of damages arising from the statutory violation by the employer. In such a case 'it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts.' *Story Parchment Co. v. Paterson Parchment Co.*, 282 U.S. 555, 563, 51 S. Ct. 248, 250, 75 L.Ed. 544.

*Anderson,* 328 U.S. at 688.

Thus, when the employee has made a prima facie showing, the employer must "come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." *Id.* If the employer fails to produce such evidence, the "court may then award damages to the employee, even though the result be only approximate." *Id.*

### A. Amount of Damages

In an earlier ruling, the court determined that Defendant Kevin Lynch is an "employer" under the FLSA and is liable for unpaid wages under the FLSA, the IMWL, and the IWPCA. *Arteaga*, 2012 WL 3819899. Plaintiffs now seek an award of their damages. In support, they submit an Order for Administrative Expense issued by Judge Wedoff in Duraco's previous bankruptcy proceeding (Ex. A to Plaintiffs' Motion for Entry of an Order of Judgment [126-1]); a signed affidavit from a previous employee (Ex. B [126-1]); an Excel spreadsheet specifying damages and totals for each Plaintiff (Ex. D [126-1]); a summary of Duraco's cash receipts and cash disbursements (Ex. A to Pls.' 56.1 [109-1]); copies of checks returned due to insufficient funds (Ex. O to Pls.' 56.1 [109-2]); a sampling of undisbursed checks (Ex. P to Pls.' 56.1[109-2]); Duraco bank statements (Ex. Q to Pls.' 56.1 [109-3]); a sampling of paychecks (Ex. X to Pls.' 56.1[109-3]); BCBS billing summaries (Ex. Z to Pls.' 56.1[109-3]); timestamp reports (Ex. DD to Pls.' 56.1 [109-3]); and timesheets (Ex. EE to Pls.' 56.1 [109-3]). Under the burden of proof paradigm outlined by the Supreme Court in *Anderson*, this evidence is sufficient to establish that the Plaintiffs performed work for which they were not compensated, and the amounts claimed are based on reasonable inferences. Indeed, Defendants do not dispute that the employees are owed some amounts of unpaid wages. (*See* Kevin Lynch's Sur-Reply in Opposition to Plaintiffs' Motion for Entry of Judgment [143-2] at 4.)

Defendants thus bear the burden to produce records "of the precise amount of work performed or with evidence to negative the reasonableness of the inference." *Anderson,*.328 U.S. at 687-88. Even construing the evidence in their favor on this motion, the court concludes Defendants have not met that burden, as explained below.

14

### 1.    Cleared checks/wire transfers

Defendants argue, first, that the amounts claimed fail to reflect certain wages recovered when multiple checks cleared or funds were wire-transferred to Plaintiffs.  (*see* Kevin Lynch Response [134], at 4.)   Defendants identify several check numbers for payments to Donna Magnuson, William Van Dusen, Patricia Seidl, Juan Rodriguez, and Kim.   None of these assertions, however, are supported with bank account records, copies of the checks, or other supporting documentation.   Plaintiffs contend that several of the payments cited by Defendants predate the periods of time for which they seek compensation; for some others, there is no evidence that the checks cleared.   Plaintiffs do concede that there may be disputes of fact with respect to certain of the paychecks and have deducted those amounts from their damages claim in this court.  (*See* Plaintiffs' Reply in Support of Motion for Entry of an Order of Judgment [137].)  With those disputes off the table, Defendants have no basis to resist judgment beyond "the mere allegations or denials of [their] pleading."  Those allegations are insufficient to rebut the reasonable inferences created by the Plaintiffs' evidence.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248.

An early case, *Wirtz v. Turner,* 330 F. 2d 11 (7th Cir. 1964), is instructive.  Plaintiff in that case, a mail carrier, alleged he was not paid for his overtime hours from April 1, 1960 to July 15, 1961.  Plaintiff identified three periods of time and estimated that he worked "52 to 53 1/2 hours per week; 50 to 52 hours per week; and 48 to 50 hours per week" during those three periods.  330 F.2d at 13.   Reversing summary judgment in favor of the employer, the Court of Appeals acknowledged that plaintiff's submissions did not establish precisely what amounts plaintiff was owed, but held that under the FLSA, a plaintiff "may recover even if the exact amount due is not capable of mathematical ascertainment."  *Id.*  In the case before this court, Plaintiffs' estimates are based on much more documentation than their own recollections or estimates: they rely on clock-in times, affidavits, and bank statements.  (*See* Employee Affidavits, Ex. B to Plaintiffs' Motion for

Entry of an Order of Judgment [126-1]; Bank Statements, Ex. Q to Pls.' 56.1 [109-3]; Timestamp Reports, Ex. DD to Pls.' 56.1 [109-3]; Timesheets, Ex. EE to Pls.' 56.1 [109-3].)

Plaintiffs are not required to establish their claims with precision. In *Harper v. Wilson*, plaintiff presented timecards, checks, and his own testimony in support of his claim for unpaid wages. 302 F. Supp. 2d 873, 882-83 (N.D. Ill. 2004). Defendants, who failed to keep accurate records, contended that plaintiff was required to present his paystubs, as well. As the court observed, however, once the employee has shown that his work was uncompensated, the burden shifts to the employer to prove "the precise amount of work performed or . . . evidence to negative the reasonableness of the inference to be drawn from the employee's evidence," *Harper*, 302 F. Supp. 2d at 883 (quoting *Anderson*, 328 U.S. at 687), and the paychecks and time cards the employer produced did not establish that plaintiff had been paid for all hours worked. Plaintiffs here present similar evidence: timecards, checks, and affidavits. In an exhibit to a proposed sur-reply, Defendants have performed belated calculations of amounts they contend Plaintiffs are owed. (Ex. A to Kevin Lynch Sur-Reply [143-2].) The court notes that even those calculations demonstrate that Plaintiffs are entitled to recover tens of thousands of dollars. More importantly, Defendants' calculations have no documentary support apart from Kevin Lynch's assertions; he offers no payroll records, no payroll check stubs, no contemporaneous pay scale information, and no bank records. In *Harper*, where defendants were unable to explain precisely how its employee's "pay was computed, what rate he was paid for overtime, or what deductions were made," the court awarded the amount supported by plaintiff's testimony. The same result is appropriate here, where Defendants offer no copies of the cleared checks or other documentary support or explanation of how the Excel spreadsheets they rely on were calculated. *See also Walton v. United Consumers Club, Inc.,* 786 F.2d 303, 314-315 (7th Cir.1986) (an employer who fails to keep accurate records must "suffer the consequences for any inaccuracy of hours worked").

Defendants' assertions that they paid other amounts via wire transfers—without supporting documentation—are also insufficient to create a genuine factual dispute.  In *Uphoff v. Elegant Bath, Ltd.*, 176 F.3d 399 (7th Cir. 1999), former employees of a kitchen and bathroom renovating company sought unpaid overtime wages, and the employer admitted that the employees had performed overtime work.  Defendant contended the workers had been compensated by way of numerous cash payments and the use of equipment and supplies, but offered no payroll records, accounting statements, receipts or other documents to establish that plaintiffs were in fact adequately compensated.  176 F.3d at 404.  The Seventh Circuit affirmed the district court's determination that, absent evidence that the payments and facility use were intended to serve as overtime compensation, the employer did not meet its burden.  *Id.* at 406.  As did the employer in *Uphoff*, Defendants here rely on the fact that some wire transfers compensated Plaintiffs and were not deducted from the total amount owed.  But no evidence identifies the hours for which those wire transfers were purportedly earmarked, and Plaintiffs assert that some of the transfers occurred during periods of time unrelated to their claims.  Absent explanation, or any documentation of the nature or purpose for the wire transfers, Defendants' assertions about the wire transfers do not create a genuine issue of material fact.  The bankruptcy court's allowance of Plaintiff's claim, while not dispositive, provides further confirmation.  Defendants have failed to show that a "genuine issue of fact" exists as to the amount of damages.

## 2.     Dorothea Schmidt's role

Defendants have suggested that Dorothea Schmidt, who was assigned to maintain payroll, gave unauthorized pay raises, holiday pay, overtime and double time not in accordance with Duraco's pay policies.  (Kevin Lynch Aff. [134-1]  ¶¶ 8-11.)  Thus, they argue that Kevin Lynch cannot be held liable for those amounts.  (Kevin Lynch Response [134] at 5-7.)  Beyond their own affidavits, no evidence supports the notion that Dorothea Schmidt manipulated the payroll.  Even

if Ms. Schmidt did act beyond her authority, these circumstances would not excuse Kevin Lynch in this case. Kevin Lynch has admitted that he gave Ms. Schmidt authority, and the court found earlier that Kevin Lynch himself retained "primary control over Duraco's payroll." *Arteaga*, 2012 WL 3879899, *6. Significantly, it was Kevin Lynch who made decisions about whether or not to issue paychecks at all when funds were low. Id. *6. The record shows, further, that Kevin Lynch kept tabs on the amounts the employees claimed they were owed, and that he wrote letters to his employees' creditors, expressing optimism that Duraco would pay them soon. *Id.* *7. Whatever Dorothea Schmidt may or may not have done (there is no evidence beyond Mr. Lynch's surmise), her conduct does not excuse Kevin Lynch or support the conclusion that Plaintiffs' calculations must be rejected.

### 3. Employer liability for overtime

Defendants argue that Duraco policies prohibited any double-time pay, and that overtime was never compensated until an employee had already worked 40 hours that week. (Kevin Lynch Response [134] at 6-7.) The documentary evidence defeats these assertions. The paystubs submitted by Plaintiffs show, on their face, that double-time was awarded on a regular basis. (Paystubs, Ex. C to Pls.' Reply in Support of Motion for Entry of Judgment [137-1].) Defendants have not suggested that the paystubs are not authentic, and in light of this evidence, Kevin Lynch's unexplained and unsupported denials do not defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248.

Plaintiffs testified that Michael Lynch himself and other managers directed them to work overtime. In any event, if an employer does not want employees to work more than straight time, "it is the duty of the management to exercise its control and see that the work is not performed. [Management] cannot sit back and accept the benefits without compensating for them." 29 C.F.R. § 785.13. The employer will be liable for overtime work performed "even where the employer has

not requested the overtime be performed or does not desire the employee to work, or where the employee fails to report his overtime hours." *Kellar v. Summit Seating Inc.*, 664 F.3d 169, 177 (7th Cir. 2011); *see also Chao v. Gotham Registry, Inc.,* 514 F.3d 280, 288 (2d Cir.2008) ("an employer [who] has knowledge of a worker's overtime activities" is liable "whether the employee agreed to work overtime voluntarily or under duress.")

So long as the employer has "actual or constructive knowledge" that the employee has performed uncompensated work, it is liable on a fair pay claim. *DeMarco v. Nw. Mem'l Healthcare*, 10 C 397, 2011 WL 3510896 (N.D. Ill. Aug. 10, 2011). The evidence in this case is that Kevin Lynch signed, or authorized his signature, on payroll checks, signed off on operating reports concerning finances, was "highly involved in the day-to-day operations of Duraco," *Arteaga*, 2012 WL 3879899 *7, and therefore had actual or constructive knowledge that employees were working overtime. (Kevin Lynch Dep. [118] at 80, 119.) Defendants' objection to overtime claims is overruled.

### 4. Trustee Period

The Seventh Circuit has not ruled on the issue of whether employers are liable under the FLSA for violations during and after bankruptcy proceedings. In *Stafford v. Puro*, 63 F.3d 1436, 1445 (7th Cir. 1995), the Court of Appeals found that the owners of Purofied Down Products Corporation were personally liable under the IWPCA for unpaid wages during the course of a Chapter 11 bankruptcy. Furthermore, other circuits have found that officers of a corporation are liable through bankruptcy proceedings for violations of FLSA. *See Boucher v. Shaw*, 572 F.3d 1087, 1093-94 (9th Cir. 2009) (holding that the company's bankruptcy has no effect on the claims against the individual managers under the FLSA where the defendants include the CEO, CFO, and the person in charge of labor and employment matters). The court agrees with Kevin Lynch, however, that he ought not be held liable for unpaid wages after he was, by operation of the

19

bankruptcy court and its trustee, no longer in operational control over Duraco. In an exhibit to his proposed sur-reply, Kevin Lynch has identified a handful of wage claims for pay periods after the bankruptcy trustee had taken control over Duraco. The court agrees that Defendants are not liable for those claims and will direct Plaintiffs to submit an amended proposed judgment order that eliminates them.

### 5. IRS Lien

Kevin Lynch notes that the IRS has filed a lien for unpaid taxes. The court agrees with Plaintiffs that the IRS lien does not affect the amounts they are owed. The lien is limited to the amounts Lynch himself owes to the IRS. If some part of that lien is for employee taxes, the employees themselves will be liable for those amounts after they receive their unpaid wages.

### B. Liquidated Damages

Section 216(b) of the FLSA, provides for liquidated damages in the form of doubling the award for unpaid overtime compensation or unpaid minimum wages. 29 U.S.C. § 216(b) (Supp.1993). As originally written, the FLSA made doubling mandatory. *See Overnight Motor Transportation Co. v. Missel,* 316 U.S. 572, 581 (1942). The Act was amended in 1947 to render the doubling provision discretionary, but there remains a strong presumption in favor of doubling. *See Walton v. United Consumers Club,* 786 F.2d 303, 310 (7th Cir.1986). Thus, under the present scheme, double damages remains the norm, while single damages are the exception, and the employer bears the burden of defeating such an award by showing that it acted in good faith and with reasonable grounds to believe it was not violating the law. *Id.* at 310; *see also Shea v. Galaxie Lumber & Const. Co., Ltd.*, 152 F.3d 729, 733 (7th Cir. 1998) (double damages "mandatory" unless the defendant makes such a showing). Kevin Lynch knew his employees were not being paid, acted intentionally in withholding their paychecks, and acknowledges in this lawsuit that they have not been fully compensated. The law requires an award of double damages on this record.

20

C.     Michael Lynch's Employer Status

Under the FLSA, an "employer" is "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). Whether a person or entity qualifies as an employer under the Act is a question of law. *Karr v. Strong Detective Agency, Inc.,* 787 F.2d 1205, 1206 (7th Cir.1985). The word "employer" is defined broadly under the FLSA to fulfill Congress's remedial intent. *Nationwide Mutual Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992); *Bastian v. Apartment Inv. and Mgmt. Co.*, No. 07 C 2069, 2008 WL 4671763 (N.D. Ill. Oct. 21, 2008). More than one person may be an employer and liable for FLSA violations simultaneously under the Act. *Villareal v. El Chile, Inc.*, 776 F. Supp. 2d 778, 784-85 (N.D. Ill. 2011), citing *Falk v. Brennan,* 414 U.S. 190, 191 (1973)). Courts evaluating FLSA claims have imposed liability on individuals in a range of corporate positions, including general managers, provided such individuals acted on behalf of the corporation to cause the violations. *Dole v. Simpson,* 784 F. Supp. 538, 545 (S.D. Ind.1991); *Villanueva v. Falcon Const. Co., Inc.*, No. 2:09-CV-107-PPS-PRC, 2011 WL 1114430, *2 (N.D. Ind. Mar. 24, 2011). In some circumstances, another employee may be liable, so long as that employee had supervisory authority over the unpaid worker and was responsible in whole or part for the alleged violation. *Riordan v. Kempiners*, 831 F.2d 690, 694 (7th Cir. 1987).

To determine whether an individual is an employer, courts often utilize the "economic reality" test, a fact-based inquiry that is not intended to be rigid or formalistic. *See generally Goldberg v. Whitaker House Co-op, Inc.,* 366 U.S. 28, 33 (1961) (economic reality should govern the determination of employer status under the FLSA). In applying this test, courts consider "all the circumstances of the work activity." *Sec'y of Labor v. Lauritzen*, 835 F.2d 1529, 1534 (7th Cir. 1987) (articulating a test for determining who is an "employee" under the FLSA, but not for identifying a person who might be deemed an "employer"). The First and Ninth Circuits utilize a four-factor analysis which has been used often by district courts in this Circuit as well. *See Bay*

*State Alternative Staffing Inv. v. Herman,* 163 F.3d 668, 675 (1st Cir.1988); *Bonnett v. Calif. Health and Welfare Agency,* 704 F.2d 1465, 1470 (9th Cir.1983) (overruled in part on unrelated grounds in *Garcia v. San Antonio Metropolitan Transit Auth.,* 469 U.S. 528 (1985)); *see, e.g., Nehmelman v. Penn Nat. Gaming, Inc.*, 790 F. Supp. 2d 787, 795 (N.D. Ill. 2011). Those factors include whether the alleged employer "(1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Babych v. Psychiatric Solutions, Inc.*, 09 C 8000, 2011 WL 5507374 (N.D. Ill. Nov. 9, 2011) (quoting *Bonnette,* 704 F.2d at 1470.) The ultimate question is whether the individual had "supervisory authority over the complaining employee" and is "responsible in whole or part for the alleged violation." *Hernandez v. City Wide Insulation of Madison, Inc.*, 05-C-303, 2006 WL 1993552 (E.D. Wis. July 14, 2006) (quoting *Riordan,* 831 F.2d at 694). No one factor is dispositive. *Brock v. Superior Care, Inc.,* 840 F.2d 1054, 1059 (2d Cir.1988). Instead, the court considers the totality of the circumstances that underscore the economic reality of the employment relationship. *Villareal*, 776 F. Supp. 2d at 785; *Donovan v. Sabine Irrigation Co., Inc.,* 695 F.2d 190, 194 (5th Cir.1983)).

As noted, Michael Lynch denies that he possessed the power to fire employees. In at least one instance, Michael Lynch admits he threatened to fire Rudy Seidl, a production employee, but Michael Lynch contends the threat was a response to being threatened with a large socket wrench. And although Plaintiffs contend that after this heated exchange, Michael Lynch actually did fire Mr. Seidl's wife Patricia, Michael Lynch insists he did not terminate Patricia Seidl, but instead merely asked her to leave what was, in his opinion, an "unprofessional" atmosphere. (*See* Michael Lynch Response [135] at 2; Michael Lynch Dep. [119] at 122.) It is uncontested, however, that Bill Sasser and other higher level managers had the ability to hire and that Bill Sasser reported directly to Michael Lynch. (*See* Michael Lynch Dep. [119] at 34, 35, 37.) Sasser recalled hearing Michael admit to having fired employees. That Sasser, who was subordinate to Michael Lynch, had hiring

and firing authority, strongly suggests Michael Lynch had it as well.  The court concludes this factor weighs in favor of finding Michael Lynch an employer for purpose of the FLSA.

With respect to Michael Lynch's supervisory role and his control over work schedules or conditions of employment, the court notes the undisputed evidence that Sasser and others reported directly to him.  In addition, Michael Lynch admitted that it was his responsibility to "oversee production at the plant."  (*Id.* at 88.)  Defendants assert that the responsibility to set work schedules was assigned to Stocki and Sasser.  (*see* Kevin Lynch Aff [134-1] ¶ 3.)  Yet the October 2009 e-mail message from Michael Lynch to John Cirillo demonstrates that although Michael Lynch did not create the schedule, he had final authority over it: in no uncertain terms, Michael Lynch warned Cirillo that any changes to the schedule must be approved by him.  *Id.*  Furthermore, although Michael Lynch did not staff the hourly employees, he did contract with temporary employee agencies for necessary labor.  (*See* Michael Lynch Dep. [119] at 38, 92.)  Plaintiffs have also offered evidence that individual employees considered him to be an employer and were directed by him to continue working, even when paychecks were not being paid.  (*See* Maria Arteaga Dep. [109-2] at 11; Ofelia Arteaga Dep.[109-2] at 12; Sasser Aff. [128-1] ¶ 12.)  This factor, too, weighs in favor of the conclusion that Michael Lynch is an employer under the FLSA.

There is little evidence that Michael Lynch determined the rate or method of payment. Unlike Kevin Lynch, Michael Lynch did not sign off on checks or approve the payroll.  An individual may be deemed an employer even if he is not solely responsible for determining the rates and methods of payment, however; "significant participation" in those decisions may be sufficient. *Hernandez v. City Wide Insulation of Madison, Inc.*,  05-C-303, 2006 WL 1993552 (E.D. Wis. July 14, 2006); *see also Herman v. RSR Sec. Servs. Ltd.,* 172 F.3d 132, 139 (2d Cir. 1999) (stating that "[c]ontrol may be . . . exercised only occasionally, without removing the employment relationship from the protections of the FLSA, since such limitation on control does not diminish the significance of its existence").  Though Michael Lynch did not sign paychecks, he had significant influence on

the amount employees were paid.  Like the defendant at issue in *Hernandez*, Michael played a consulting role to Kevin Lynch who controlled the payroll, and he spoke with employees about pay issues on the plant floor and in meetings.  The court concludes the third factor is, at worst for Plaintiffs, inconclusive in determining Michael Lynch's status.  Finally, as there is no evidence that Michael Lynch maintained employment records as a part of his duties at Duraco, the fourth factor weighs against a finding that Michael Lynch is an employer.

Beyond application of the four-factor analysis, the court notes that the Seventh Circuit puts great weight on the alleged employer's ability to bring about the violations of the FLSA.  *See Riordan,* 831 F.2d at 694.  Michael Lynch was aware that Duraco employees were not getting paid every week.  (*See* Michael Lynch Dep. [119] at 60-62, 73.)  An individual's knowledge that employees were receiving paychecks returned for insufficient funds weighs in favor of finding that an individual to be an employer under the FLSA.  *Reich v. Harmelech*, No. 93C3458, 1996 WL 308272 (N.D. Ill. June 5, 1996).  In this case, Michael Lynch acknowledged that he  discussed the payroll issues on the floor with employees and directed Bill Sasser how to respond to complaints. (Michael Lynch Dep. [119] at 73; Sasser Aff. [128-1] ¶ 8-9.)  Michael Lynch encouraged employees to keep working, even though he knew that Duraco would be unable to make payroll. He made promises to employees that the company would "make good" on their paychecks.  In the court's view, these promises support an inference that Michael Lynch believed he had enough control over payroll to assure the employees that their wages would be paid.  Michael Lynch's involvement with employee pay issues weighs in favor of finding him liable in this case

The *Villareal* case*,* cited by both parties, is distinguishable.  In *Villareal*, the court denied the plaintiffs' motion for summary judgment as to the defendants' status as employers because the evidence was unclear whether the defendants were a part of the day-to-day operations of the business or whether they had delegated those functions to the managers. 776 F. Supp. 2d at  784. Defendants in *Villareal* actually resided in Mexico for a substantial portion of the time when the

violations were alleged to have occurred—facts quite different from this case. There certainly are contested facts here, but it is not disputed that Bill Sasser regularly reported to Michael Lynch, or that Michael himself spent time on the plant floor talking to employees. Nor does this case resemble *Gray v. Powers,* 673 F.3d 352, 353-54 (5th Cir. 2012) where the defendant visited the worksite on "only . . . five or six occasions during the seventeen months the club was open for business." Instead, Michael Lynch's personal contacts with employees to discuss their payroll concerns, and directions to Bill Sasser about how to address those concerns weigh in favor of finding Michael Lynch an employer. *See Villanueva v. Falcon Const. Co., Inc.*, No. 2:09-CV-107-PPS-PRC, 2011 WL 1114430 (N.D. Ind. Mar. 24, 2011) (defendant who calculated payroll and who dealt directly with the plaintiff regarding her payroll concerns, responding to questions about when she would be paid, deemed an employer).

The Fifth Circuit's analysis of similar facts is illustrative. In *Reich v. Circle C. Investments, Inc.*, 998 F.2d 324, 329 (5th Cir. 1993), the defendant claimed he was not an "employer" under the FLSA because his "consulting" agreement with the company excluded personnel matters from his job description. He also had no ownership interest and did not control the day-to-day operations of the corporation. *Id.* The court found none of those circumstances dispositive. The defendant was indeed an employer, the court held, because he hired employees, was known to be a supervisor, signed payroll checks, and gave specific instructions to employees. *Id.* Similarly, Michael Lynch gave instructions to employees, was recognized to be one of the owners, exercised scheduling authority, and claimed authority to fire employees. Furthermore, Michael Lynch was involved in the operation of Duraco and spoke to employees regularly about payroll issues. In light of "all the circumstances of the work activity," *Lauritzen*, 835 F.2d at 1534, the court concludes that Michael Lynch is an employer under the FLSA.

## II.    The IMWL Claims

The court's analysis of Plaintiffs' FLSA claims similarly applies to Plaintiffs' IMWL claims, because the two statutes are substantively congruent.  *See, e.g., Condo v. Sysco Corp.*, 1 F.3d 599, 601 (7th Cir. 1993) (applying the same analysis to the plaintiff's FLSA and IMWL claims for unpaid overtime wages); *see also Ladegaard v. Hard Rock Concrete Cutters, Inc*., No. 00 C 5755, 2004 WL 1882449 *4 (N.D. Ill. Aug. 18, 2004) ("[c]ourts have generally held that the IMWL parallels the FLSA") (collecting cases).  The Illinois Administrative Code also approves FLSA regulations as guidance in interpreting the IMWL (Ill. Admin. Code tit. 56, pt. 210.120 (2009)), and courts have recognized that "federal decisions interpreting the FLSA also apply to claims asserted under the IMWL."  Plaintiffs are entitled to summary judgment on their IMWL claim for unpaid minimum wages (Count III) and unpaid overtime wages (Count IV), as well.

## III.    The IWPCA Claims

The court's analysis under the IWPCA is somewhat different, yet yields essentially the same result.  The IWPCA requires that "[a]ll wages earned by an employee during a semi-monthly or biweekly pay period shall be paid to such employee not later than 13 days after the end of the pay period in which such wages were earned."  820 ILCS 115/4.  Adopting language from the FLSA, the IWPCA defines the term "employer" as including "any person or group of persons acting directly or indirectly in the interest of an employer in relation to an employee." 820 ILCS 115/2.  According to the Illinois Supreme Court, however, there is no need to apply the economic realities test to determine who constitutes an employer under the IWPCA, because, unlike the FLSA, the IWPCA expressly imposes liability on "those individual decision makers who knowingly permitted the Wage Act violation."  *Andrews v. Kowa Printing Corp.*, 217 Ill.2d 101, 109, 111-12, 838 N.E.2d 894, 899-900, 901 (Ill. 2005); *see also* 820 ILCS 115/13 (stating that "employer" status "includes any officers

of a corporation or agents of an employer who knowingly permit such employer to violate the provisions of [the IWPCA]").

The evidence that supports a liability finding on Plaintiffs' FLSA and IMWL claims also shows the Defendants "knowingly permit[ted]" Duraco to violate the IWPCA provision requiring payment of wages within thirteen days after the end of a pay period. There is no doubt that the Defendants were fully aware of Duraco's financial instability and that they decided to continue operations long after repeated incidents in which Duraco did not pay Plaintiffs the wages they were due. The court concludes that the individual Defendants were "employers" under the IWPCA and grants summary judgment against the Defendants on the IWPCA claims for earned wages and vacation pay.

## CONCLUSION

For the reasons explained herein, the court grants Plaintiffs' motion for summary judgment [126] against Defendant Kevin Lynch regarding the amount of his liability on the claims for unpaid wages brought under the FLSA, the IMWL, and the IWPCA. The court also grants Plaintiff's motion for summary judgment against Michael Lynch [128] regarding his status as an "employer" under the FLSA and his liability on the claims for unpaid wages brought under the FLSA, the IMWL, and the IWPCA. The court previously denied Defendant Kevin Lynch's motion fo leave to file a Sur-Reply [143] and stands by that ruling, though the court did consider some of the material submitted with that brief. The Clerk is directed to terminate that motion. Plaintiffs are directed to submit a proposed revised judgment order consistent with the court's determinations that Defendants are not liable for unpaid wages during the period of time in which Duraco was under control of the bankruptcy trustee.

ENTER:

Dated: September 26, 2013

_____
REBECCA R. PALLMEYER
United States District Judge